**IDEAL BASIC INDUSTRIES, INC., formerly known as Ideal Cement Company, Plaintiff-Appellant,**

v.

**Rogers C. B. MORTON, Individually and as Secretary of the Interior of the United States, Defendant-Appellee.**

**No. 74–2298.**

United States Court of Appeals, Ninth Circuit.

Sept. 28, 1976.

Rehearing and Rehearing En Banc Denied Nov. 16, 1976.

Robert P. Davison (argued), of Holland & Hart, Denver, Colo., for plaintiff-appellant.

Carl Strass (argued), Dept. of Justice, Washington, D.C., for defendant-appellee.

Before DUNIWAY, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Ideal Basic Industries, Inc. (Ideal) appeals the granting by the district court of a motion for summary judgment made by the Secretary. Ideal in this action seeks relief from an adverse agency ruling which reversed an earlier administrative action favorable to a patent application filed by Ideal. The district court determined that Ideal had failed to exhaust its administrative remedies prior to seeking the desired relief. On this basis it granted the motion for summary judgment. We affirm, but we reach our result by a course somewhat different from that employed by the trial court.

I.

*Facts.*

In 1965 Ideal located and filed for patents on 45 limestone mining claims in the Tongass National Forest in Alaska. The Forest Service of the Department of Agriculture contested the claims alleging that there had been no discovery of a valuable mineral deposit as required by 30 U.S.C. § 22. Based on stipulated facts, a hearing examiner determined that no valuable mineral deposit had been discovered and denied the application. An appeal was taken to the Director of the Bureau of Land Management (Director) who reversed the examiner's decision in a ruling on June 25, 1970. The Bureau of Land Management (BLM) decision, which was approved by the affixed signature of an Assistant Secretary of Interior, recited that it was the final administrative action of the Department of the Interior.

On July 1, 1970, the Interior Board of Land Appeals (IBLA) came into existence pursuant to 35 Fed.Reg. 10,012 (1970) and replaced the Director of the BLM and the Secretary of Interior as the appellate administrative body designated to review mining patent applications. On July 24, 1970, the Forest Service petitioned the IBLA for reconsideration of the June 25, 1970 decision of the Director. On March 23, 1972, the IBLA vacated the decision of the Director and remanded the application to the hearing examiner upon the ground that the stipulated facts did not support the decision and that, under the circumstances, further factfinding was necessary. *United States v. Ideal Cement Co.,* 79 I.D. 117 (1972). The hearing on remand was postponed and the IBLA decision was approved by the Secretary as the "final decision" of the Interior Department on April 16, 1973. This action was filed in the district court on September 26, 1972.

Two claims were presented to the district court by Ideal. The first was that the written decision of the Director of the BLM constituted final administrative action on the question of adequacy of discovery of a valuable mineral deposit which deprives the

Secretary and the agencies of his Department of jurisdiction to reconsider the Director's June 25, 1970 decision. Ideal's second contention was that the stipulated facts supported the June 25, 1970 decision and that, even assuming that subsequent administrative action was permissible, a reversal of the Director's decision was arbitrary and capricious.

The district court decided first that the IBLA, acting for the Secretary, had authority to reconsider the June 25, 1970 decision of the Director. The court then determined that the IBLA's decision of March 23, 1972 was not final administrative action because the IBLA had remanded the matter to a hearing examiner to develop additional facts. Additional administrative proceedings were necessary. Thus, there existed a failure to exhaust administrative remedies which precluded the court from considering the claim that the IBLA's action was arbitrary and capricious. It is from these decisions that Ideal brings this appeal.

We hold that the IBLA did have authority to reconsider the Director's June 25, 1970 decision and that, as a consequence, Ideal has not exhausted its administrative remedies. Implicit in these holdings is our conclusion that the Director's June 25, 1970 decision was not compelled by the stipulated facts. This being the case, the IBLA's remand to the hearing examiner for the taking of additional evidence was not arbitrary or capricious. Our reasons for these holdings are as follows.

## II.

*Authority of the IBLA to Reconsider the Decision of the Director.*

Relying on 43 C.F.R. § 1844.1 (1970),[1] Ideal contends that because the Director's opinion had been approved by the Assistant Secretary, no further consideration could be given to it and no motion for reconsideration by the Forest Service could be entertained.

We do not read § 1844.1 (1970) so broadly. Its thrust is to preclude repetitious appeals to the Secretary by those aggrieved parties whose responsibilities do not embrace or touch upon, the management of federal public lands. Those having such responsibilities are not precluded by § 1844.1 (1970) from undertaking, or requesting, in a timely manner a reconsideration of a decision, albeit one designated as final with respect to a claimant, concerning the disposition of public lands.[2]

Application of this principle is particularly appropriate in this case in view of the reorganization of hearings and appeals procedures which follow close on the heals of the Director's decision. The assumption on July 1, 1970 by the IBLA of jurisdiction over all appeals pending before the Director warrants consideration by the IBLA of what in essence was a petition for rehearing instituted by the Forest Service and filed on July 24, 1970.

Recognition of the IBLA's power to reconsider under the circumstances of this case is consistent with the fact that it has long been recognized that the Secretary of Interior has broad plenary powers over the disposition of public lands. *Cameron v. United States*, 252 U.S. 450, 459–64, 40 S.Ct. 410, 64 L.Ed. 659 (1920); *Knight v. United States Land Association*, 142 U.S. 161, 177, 12 S.Ct. 258, 35 L.Ed. 974 (1891); *United States v. Williamson*, 75 I.D. 338, 342 (1968). He has a continuing jurisdiction with respect to these lands until a patent issues,

---

1. 43 C.F.R. § 1844.1 (1970), provided in part:
   Any party adversely affected may appeal to the Secretary of the Interior from a final decision of the Director, whether such final decision is on an appeal or is an original decision, except from such a decision which, prior to promulgation, has been approved by the Secretary.
   A similar regulation, applicable to appeals to the Interior Board of Land Appeals is presently

in effect. 43 C.F.R. § 4.410 (1975). The now revoked 43 C.F.R. § 1844.1 also supplied a means for an aggrieved party to resort to judicial review.

2. *See* 43 C.F.R. § 4.21(c) which explicitly permits reconsideration when circumstances warrant and implies that it is an alternative to seeking judicial review.

and he is not estopped by the principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors in interest. *United States v. United States Borax Co.*, 58 I.D. 426, 430 (1943); *see In re Burnaugh*, 67 I.D. 366 (1960). So long as the legal title remains in the Government, the Secretary has the power and duty upon proper notice and hearing to determine whether the claim is valid. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336–40, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cameron v. United States, supra*, 252 U.S. at 460–61, 40 S.Ct. 410. Where additional evidence is necessary for a final determination, it is appropriate to set aside a former decision and remand a contest proceeding for further hearings. *See United States v. Kosanke Sand Corp.*, 12 I.B. L.A. 282, 305 (1973). Therefore, even though the BLM had determined Ideal's claim to be valid and the Assistant Secretary approved as final that determination, the Department had authority to reconsider its prior decision and to consider the sufficiency of the record made in connection with the patent application.[3]

### III.

### *The Remand to the Hearing Examiner was not Arbitrary or Capricious.*

Mere authority to reconsider, however, does not entitle the Secretary to act in an arbitrary or capricious manner. To affirm the trial court's disposition of this case we must determine that the IBLA's remand for taking additional evidence was neither arbitrary nor capricious. A contrary determination would make a further pursuit of

administrative remedies futile and entitle Ideal to the relief it seeks.

To determine whether the IBLA's remand escapes characterization as arbitrary or capricious we must examine the stipulations which lie at the heart of this case and the circumstances surrounding their formulation.

The application for patent was filed in 1965 by Ideal's predecessor in interest. The Forest Service of the United States Department of Agriculture initiated a contest claiming that "[n]o discovery of a valuable mineral has been made . . . because the mineral materials present cannot be marketed at a profit." Ideal answered, and at a prehearing conference the parties agreed to submit a stipulation of all material facts upon which the examiner was to base his decision. That stipulation is set forth in the Appendix.

The stipulation sets forth that Ideal is a relatively large corporation with plants, facilities, and quarries located in 14 states and has been engaged in producing cement from limestone since 1904, with a productive capacity in 1967 of 41,000,000 barrels. It is not disputed that the patent application properly met the requirements of date of location, exploration activity, location procedures and amount of discovery work expended per claim. Also agreed upon are the approximate size of the ore body, the fact that limestone is suitable for making cement, and that because of terrain and surface conditions the claims are chiefly valuable for limestone.

■ Difficulty arises, however, in regards to the interpretation of two key stipulations. Stipulation number 8 provides:

---

**3.** The revision of the Interior Regulations, 35 Fed.Reg. 10,012 (1970), provides in pertinent part:

(b) Effective July 1, 1970, in the exercise of the supervisory authority of the Secretary, appeals taken to the Director of the Bureau of Land Management in the following categories of cases shall be transferred to and finally decided by the Board of Land Appeals in the Office of Hearings and Appeals, Office of the Secretary, without a further right of appeal in the Department:

.   .   .   .   .

(2) Appeals to the Director taken in other cases from decisions issued prior to July 1, 1970, which appeals are pending before the Director on July 1, 1970, or are received thereafter.

As indicated in our discussion of the authority of the Secretary of the Interior and footnote 2, *supra*, reconsideration is appropriate where circumstances warrant. 43 C.F.R. § 4.21(c). After July 1, 1970, the only Interior division which could entertain the motion for reconsideration was the IBLA.

The limestone on the subject claims can be presently used in the manufacture and sale of cement at a profit. The agreed estimated per-ton cost of limestone from these claims delivered at Ideal's Seattle plant is $1.94, including a 25-year amortization charge. Presently, Ideal is supplying its Seattle plant from its own and other limestone sources on Texada, British Columbia, at a per-ton delivered cost of $1.48.

Stipulation number 9 states:

The Seattle, Washington, plant of Ideal is a market for limestone from the subject claims, together with other plants of Ideal along the Pacific coast. The Seattle plant site was used by Ideal as a terminal beginning in 1959; the present plant construction began in 1965 and the plant commenced operation March 15, 1967.

Ideal contends that these two stipulations amount to an admission of discovery of a valuable mineral. Consequently it argues that the IBLA decision requiring more administrative factfinding was arbitrary and capricious. We disagree.

■ The mineral land and mining laws provide that all valuable mineral deposits in lands belonging to the United States shall be free and open to exploration and purchase. 30 U.S.C. § 22. The intent of these laws is to reward and encourage the discovery of minerals that are valuable in an economic sense. *United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968). Accordingly, the "prudent-man test" and the "marketability test" have been formulated to serve these ends. Under these tests an applicant for a patent must establish (1) that the deposits were of such a character as to justify a man of ordinary prudence in expending further labor and means with a reasonable prospect of success in developing a valuable mine, *Castle v. Womble*, 19 L.D. 455, 457 (1894), and (2) that the mineral could be extracted and marketed at a profit. *United States v. Coleman, supra* at 602–03, 88 S.Ct. 1327. Application of these tests makes it clear that profit over cost must be realizable

from the material itself and it is that profit which must attract the reasonable man. *Melluzzo v. Morton*, 534 F.2d 860, 864 (9th Cir. 1976).

■ The stipulations set forth in the margin together with the record of this case do not enable us to say that a presently valuable mineral has been discovered. Nowhere is it stated that limestone costing $1.94 delivered at Ideal's Seattle plant presently would be used by Ideal in the production of cement or could be sold to other producers at that point. Nor is there within the stipulations any indication that the limestone could be sold to others at a profit either at its site or elsewhere. Stipulations 8 and 9 only make clear that Ideal could presently use the limestone "in the manufacture and sale of cement at a profit" at the Seattle plant and that the "market" for the limestone consists of that plant "together with other plants of Ideal along the Pacific coast." We do not believe this is sufficient to meet the "marketability test."

Our reason for this conclusion is that stipulations 8 and 9 are essentially ambiguous. A reasonable interpretation of them is that Ideal could use limestone costing $1.94 f.o.b. Seattle in the manufacture and sale of cement at a profit because of large profits it derives from either the manufacturing or selling processes or from both. Profits derived from sources other than the limestone itself cannot be imputed to the material for the purpose of satisfying the "marketability test." *Melluzzo v. Morton*, supra, at 864.

We acknowledge that the stipulations are not inconsistent with the hypothesis that, even though Ideal presently employs limestone costing $1.48 in its Seattle plant, limestone costing $1.94 presently could be sold to others manufacturing cement in the Seattle area. Mere consistency with this hypothesis is not enough, however, to make the Secretary's remand for further factfinding arbitrary or capricious. The failure of the stipulations to state specifically that there exists in Seattle customers for $1.94 limestone other than Ideal suggests strongly that Ideal could only employ the limestone presently by sacrificing profits prop-

erly attributable to manufacturing or selling.

Moreover, the stipulations taken as a whole indicate that the limestone has present value, not because it presently can be marketed at a profit, but because it is inevitable that someday it will be marketed at a profit. These future profits, discounted properly, fix the present value of the limestone. The existence of present value alone, however, is not enough to satisfy the marketability test. To meet this test it must be established that the limestone *presently* could be extracted and marketed at a profit. The stipulations do not unambiguously establish this.

■ This conclusion is not contrary to our previous holdings that actual successful exploitation of a mining claim is not required to satisfy the prudent man and marketability tests. *Clear Gravel Enterprises, Inc. v. Keil,* 505 F.2d 180, 181 (9th Cir. 1974); *Verrue v. United States,* 457 F.2d 1202, 1203 (9th Cir. 1972); *Barrows v. Hickel,* 447 F.2d 80, 82 (9th Cir. 1971). It is present marketability that is required, not present marketing. *Melluzzo v. Morton, supra; Barrows v. Hickel, supra* at 83. The test of marketability is not satisfied by the existence of a possible market for the mineral at some future date under altered economic conditions. *United States v. Winegar,* 16 I.B.L.A. 112, 125–26, 167–71, 177–78 (1974). A claimant cannot rely on speculative future marketability to supply present value. *Barrows v. Hickel, supra* at 83; *see Melluzzo v. Morton, supra.*

## IV.

### Failure to Exhaust Administrative Remedies.

The authority of the IBLA to reconsider the Director's decision and the ambiguity of the stipulations indicate that a remand for further hearings is not improper.

■ Notwithstanding the Secretary's April 16, 1973 designation of the March 23, 1972 decision of the IBLA as "final," it is clear it was not final agency action within the meaning of section 10, Administrative Procedure Act, 5 U.S.C. § 704.[4] *Cf. Union Oil Co. of California v. Udall,* 110 U.S.App. D.C. 124, 289 F.2d 790, 792 (1961). The decision only required Ideal to participate in a factfinding hearing on the issue of discovery of a valuable mineral. The Secretary has not yet rejected Ideal's application for a patent, and until such a rejection, or similar irreparable injury to Ideal, further judicial intervention is inappropriate. *Union Oil Co. of California v. Udall, supra* at 792; *see Rawls v. Secretary of Interior,* 460 F.2d 1200, 1201 (9th Cir.), *cert. denied,* 409 U.S. 881, 93 S.Ct. 209, 34 L.Ed.2d 135 (1972); *Davis v. Nelson,* 329 F.2d 840, 847 (9th Cir. 1964).

■ We are buttressed in this holding by the fact that the Department of the Interior is an agency with special expertise in the determination of the validity of mining claims. *Best v. Humboldt Mining Co.,* 371 U.S. 334, 338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Multiple Use, Inc. v. Morton,* 504 F.2d 448, 452 (9th Cir. 1974). As was stated in *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969):

. . . [I]t is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. . . .

The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agen-

---

4. Section 704 provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsiderations, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

cy until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, "[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy." This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise. (footnote omitted).

Presently, the Department has not completed its action nor has it exceeded its jurisdiction. Nowhere is it claimed that Ideal will suffer irreparable injury as a result of additional factfinding. Similarly, it cannot be claimed that further hearings will not afford Ideal the remedy it seeks. Cf. *Phillips Petroleum Co. v. Brenner*, 127 U.S.App.D.C. 319, 383 F.2d 514, 518 (1967), *cert. denied*, 389 U.S. 1042, 88 S.Ct. 785, 19 L.Ed.2d 833 (1968). These observations are based on the assumption that the rehearing ordered by the IBLA will proceed expeditiously forthwith. Nothing we have said is intended to countenance unreasonable delay in this rehearing.

AFFIRMED.

TRASK, Circuit Judge (dissenting):

My examination of the law as applied to the facts leads me to a different conclusion than that adopted by the majority. I would agree with the essential facts as stated, but would conclude that the decision of the Interior Board of Land Appeals (IBLA) was arbitrary and capricious. Thus, I would reinstate the judgment of the Director of the Bureau of Land Management (BLM), which validated the patent.

The principal issue revolves around the stipulation of facts entered into between the parties, and its sufficiency to support the application.

We are concerned with a group of limestone placer claims on Heceta Island within the Tongass National Forest in Alaska. An application for a patent to the claims was made by Ideal Basic Industries (Ideal). The application was based upon an agreed stipulation of facts between Ideal and the Forest Service in lieu of a hearing and determination of facts. No question has been raised by the parties as to the validity or accuracy of that stipulation. There is no suggestion of fraud in the case. The good faith of Ideal in acquiring the claims is not in issue. (Stipulation No. 6.) The timber has been removed pursuant to license issued by the Forest Service and the land is not considered satisfactory for recreation, residence or industrial use because of terrain. (Stipulation No. 7.)

The contest is limited to the "marketability" part of the two-part test for patentability and no question has been raised as to the "prudent-man" part of the test. The Forest Service as contestant has charged that

"No discovery of a valuable mineral has been made within the limits of the claims because the mineral materials present cannot be marketed at a profit and it has not been shown that there exists an actual market for these materials."

The two questions are:

1. Can the mineral materials be marketed at a profit; and,

2. Has it been shown that an actual market exists for these materials.

The solution of this controversy does not depend upon an evaluation of conflicting expert testimony or the sufficiency of oral testimony as in *Melluzzo v. Morton*, 534 F.2d 860 (9th Cir. 1976), No. 74–2683; *Clear Gravel Enterprises, Inc. v. Keil*, 505 F.2d 180 (9th Cir. 1974); or, *Verrue v. United States*, 457 F.2d 1202 (9th Cir. 1972). The case before us has as its foundation a precise delineation of facts.

In arriving at its conclusion that the marketability test has not been met, the majority appear to argue that the "profit over cost must be realizable from the material itself." In the next paragraph, the majority state that the fact that Ideal could presently use the limestone "in the manufacture and sale of cement at a profit" is not sufficient to meet the marketability test. No authority is cited for this assertion and I

have been able to find none. *Melluzzo v. Morton, supra,* does not so hold. That issue does not appear in *Melluzzo.* In *United States v. Gibbs,* 13 IBLA 382 (1973), the Interior Board of Land Review recognizes the practice of processing a mineral or material sought to be patented and then selling the processed material. Said the Board:

"In 1966 Gibbs and his co-owner filed an application for patent (Nevada 067140) covering the south half of both claims, which were leased that year to Stock Mill & Supply Company, Inc. . . . The company uses most of the concrete aggregate which is delivered to its ready-mix concrete plant at a different location. Its operation has been profitable since its inception." *Id.* at 386.

Here, Ideal proposes to extract the limestone, deliver it to its cement plant "at a different location," and the parties have stipulated that the operation would be profitable.

To the same effect is *United States v. Harenberg,* 9 IBLA 77. There the validity of a placer claim to a deposit of volcanic cinders was contested by the Forest Service for the reason that the cinders are a common variety within the meaning of Act of July 23, 1955, 30 U.S.C. § 611 (1972). The Board found that the cinders were of common variety and thus the critical issue became whether the location was validated by the discovery of a valuable deposit prior to July 23, 1955. Valid discovery was measured by the prudent man and marketability tests. In *Harenberg,* as here, the deposit was to be used by its owner to process and sell a finished product. In *Harenberg* the product was cinder block. The court applied the marketability test.

"Judge: Perhaps I should ask you this question. Could you have made in 1955 cinder blocks from the Harenberg No. 1 cinder and sold it at a profit?

"Harenberg: Yes, Right. We could have, very, very definitely.

"No evidence was introduced by the Forest Service to show that the cinders could not have been profitably extracted

and used by Harenberg in 1955." 9 IBLA at 85.

The majority here contend that stipulations 8 and 9 are ambiguous. "A reasonable interpretation of them is that Ideal could use limestone costing $1.94 f.o.b. Seattle in the manufacture and sale of cement at a profit because of large profits it derives from either the manufacturing or selling processes or from both." In some bewilderment, I point out that there is absolutely no evidence of "large profits it derives from either the manufacturing or selling processes or from both." Again, just how relevant is such a speculation? If the limestone is an essential ingredient what difference does it make that other costs are low or high? Even if the limestone cost $3.00 f.o.b. Seattle, if it is an essential ingredient and the cement can be sold at a profit, then the limestone as a part of the operation, is being extracted and marketed at a profit.

It appears clear that the two questions raised by the contestant are answered directly and unequivocally by the stipulation:

"8. The limestone on the subject claims can be *presently* used in the manufacturing and sale of cement at a profit. . . . (Emphasis supplied.)

"9. The Seattle, Washington, plant of Ideal is a market for limestone from the subject claims, together with other plants of Ideal on the Pacific coast. . . ."

In addition to the substantive reasons which require a reversal in this case, there appears to be a procedural step which IBLA and the district court have ignored. When the Government contests a mining claim, its duty as contestant is to establish a prima facie claim of invalidity, and then the burden shifts to the locator to establish the requirements of a valid claim. *United States v. Zweifel,* 508 F.2d 1150, 1157 (10th Cir. 1975); *United States v. Springer,* 491 F.2d 239, 242 (9th Cir. 1974); *Foster v. Seaton,* 106 U.S.App.D.C. 253, 271 F.2d 836, 838 (1959). The BLM, in holding that the claims were valid, referred to the asserted grounds of the contest, which were that there had been no discovery because the minerals could not be marketed at a profit

and that it was not shown that there exists a market for them, and then stated:

"After having made this charge the Forest Service, acting in behalf of the Government, then stipulated that the mining claimant could use the limestone at a profit (see stipulation No. 8) and then stipulated that the mining claimant had a market for the limestone in Seattle (see stipulation No. 9). It is therefore apparent that the very bases of the contest have, by stipulation, been established not to exist. The Government has not made out a prima facie case of invalidity. On the contrary, the Government seems to have stipulated that the claims are valid, and we are bound by the record." C.T. at 164.

The IBLA recognized this responsibility of the Government in its subsequent "reconsideration opinion." 79 I.D., at 120. However, the IBLA argued that it must take the agreement as a whole and, reading the entire agreement, found for the Government. In doing so, however, the IBLA abandoned the requirement that the Government bears the burden of establishing a prima facie case of invalidity and proceeded directly to urge that Ideal had the entire burden. "The main question presented then," it says, "is whether it has been demonstrated by a preponderance of the evidence that full compliance has been made with the requirements of the mining laws . . . ." Given the wide latitude that the Secretary of Interior has in insisting that the qualifications for patentability be met, it is a difficult task for a locator, however bona fide he may be, to persuade the Department of Interior to grant a patent. But before the Department can impose that burden upon the applicant, the Government-contestant must at least make out a prima facie case of invalidity. Here, it did not do so by the stipulation and produced no evidence of its own aliunde.

Not only did the Government fail to make out a prima facie case of invalidity, it seems to have stipulated that the claims are in fact valid.

It seems apparent that the IBLA in its decision of March 13, 1972, while giving lip service to the rule that a prima facie case of invalidity must be proved by the Government, fails to require it specifically; and when it considers the "instrument as a whole," its consideration is on the basis that the applicant has the burden—not just the ultimate burden, but the initial burden as well.

I would reverse and remand with directions to reinstate the judgment of the Director of the Bureau of Land Management which validated the patent.

APPENDIX

Stipulation of Ideal and the Forest Service before the Hearing Examiner

1. Ideal Cement Company ("Ideal") is a Colorado corporation with cement plants, terminal facilities and quarries in 14 states. It has been producing cement from limestone since 1904, and its productive capacity in 1967 was 41,000,000 barrels.

2. The date of location of the limestone placer mining claims involved in this contest and the exploration activity by Ideal are as stated in the patent application.

3. The limestone in the deposit is suitable for making cement.

4. There are approximately 200,000,000 tons of limestone within the subject claims.

5. Ideal has performed the required $500 expenditure per claim.

6. The good faith of Ideal in acquiring these claims is not in issue.

7. The subject claims are chiefly valuable for limestone. The timber has been removed pursuant to license issued by the Forest Service, and the Forest Service at the present time does not have a program of reseeding or replanting. New growth is dependent upon natural propagation. Neither is the land at the present time included in any recreation or other development plan and is not considered particularly

satisfactory for recreation, residence or industrial use because of terrain and surface baldness.

8. The limestone on the subject claims can be presently used in the manufacture and sale of cement at a profit. The agreed estimated per-ton cost of limestone from these claims delivered at Ideal's Seattle plant is $1.94, including a 25-year amortization charge. Presently Ideal is supplying its Seattle plant from its own and other limestone sources on Texada, British Columbia, at a per-ton delivered cost of $1.48.

9. The Seattle, Washington, plant of Ideal is a market for limestone from the subject claims, together with other plants of Ideal along the Pacific coast. The Seattle plant site was used by Ideal as a terminal beginning in 1959; the present plant construction began in 1965 and the plant commenced operation March 15, 1967.

10. Ideal considers the subject claims as a source of limestone for the Seattle plant as well as for the Pacific Northwest, California and Alaska areas.

11. The subject claims are readily accessible by water to the limestone market in the Pacific Northwest, Northern California and Alaska. The quarry operation contemplated by Ideal at the subject claims includes facilities to load ships and barges. The claims adjoin a deep-water harbor.

12. A potential general market exists for limestone from southwestern Alaska. There have been no sales of limestone from the subject claims or from any other southeastern Alaska source since 1949 when Permanente Cement Company briefly operated a quarry on Dall Island. Claims are being located in the same general area as the subject claims and presumably patents have been or will be applied for by others, including U. S. Steel, Sinclair Oil Company, and Lone Star Cement Company. The limestone in this deposit is chemical grade quality, being at least equal to most deposits of chemical grade limestone.

13. Based on population projections made by Ideal from data obtained from the U. S. Bureau of the Census, it is estimated that cement consumption in the Pacific Northwest and Northern California will increase 300% in the next 50 years. Present productive capacity of Ideal in the area is 6.0 million barrels annually. Thus 50 years hence Ideal projects it will need 18,000,000 barrels annual capacity in the Pacific Northwest and Northern California. On a nation-wide basis present production for the entire cement industry is, on an annual average, utilizing about 76% total capacity, but Ideal exceeds this industry figure.

14. The Redwood City, California plant of Ideal uses shell dredged from San Francisco Bay as a source of calcium carbonate. There is a distinct possibility that Congressional legislation will prohibit use of such a source of calcium carbonate for cement production. It is also possible that British Columbia may by legislation forbid exports of limestone. Ideal believes that the subject claims are a legitimate and necessary domestic reserve against these possibilities.

15. Cement plant operators in the Pacific Northwest and Northern California are faced with dwindling supplies of suitable limestone to meet the growing demand for cement. Before the expectant life of many of these plants has expired the presently-used sources of raw materials will be depleted. Southeast Alaska affords an excellent quality material, the deposit being superior to most deposits found in the lower states, and the material can be delivered economically and feasibly by water.

16. Ideal has a master plan for development of the subject claims. However, the Forest Service is concerned that there will be no incentive for Ideal to

develop the subject claims as a source of limestone.