HUMBOLDT PLACER MINING COMPANY, a corporation, and Del De Rosier, Plaintiffs-Appellants,

v.

SECRETARY OF the DEPARTMENT OF the INTERIOR OF the UNITED STATES of America, Defendant-Appellee.

No. 74–2762.

United States Court of Appeals, Ninth Circuit.

Jan. 6, 1977.

Rehearing and Rehearing En Banc Denied March 28, 1977.

William B. Murray (argued), Portland, Or., for plaintiffs-appellants.

Edmund B. Clark, Atty. (argued), of Appellate Sec., Land and NRS, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before MERRILL and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

MERRILL, Circuit Judge:

At issue are appellants' rights to compensation for the seizure by the United States of appellants' interests in certain unpatented placer mining claims, located on Stuart's Fork of the Trinity River in Trinity County, California. On June 27, 1957, the United States commenced a condemnation action in the District Court for the Northern District of California to secure title to these claims and other property for use in connection with the construction of Trinity Dam and Reservoir. Later, on March 17, 1960, the Secretary of the Interior commenced administrative proceedings to contest the validity of the claims. The jurisdictional propriety of these proceedings was challenged but ultimately upheld. *Best v. Humboldt Mining Co.*, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963). In this action appellants seek judicial review of those proceedings.

Appellants' claims were all located more than fifty years ago, but applications for patents were not made until 1954. The discovery originally claimed was of gold, assertedly embedded in the gravel of what is known as the Weaverville Formation on Stuart's Fork. The appellants' claims are northeast of the LaGrange mine, which is on the same Weaverville Formation and for many years was operated with apparent success.

Before a hearing examiner of the Bureau of Land Management, appellants asserted that the claims had value not only as a gold placer but also as a gravel deposit. Under the Act of July 23, 1955, 30 U.S.C. § 611, deposits of "common varieties" of gravel are declared not to be valuable mineral deposits within the meaning of the mining laws. Thus the facts present four dates having varying points of relevance: that of the patent application in 1954, that of the effective date of the common varieties act in 1955, that of the taking of the claims by the United States in 1957 and that of the filing of contest by the United States in 1960. Arguments can be advanced in support of any one of them as the critical date for ascertainment of either gold or gravel value. We resist the temptation to resolve the question. Instead, we assume for the purposes of this case that if value existed on any one date, it existed on all.

The hearing examiner held that value was lacking both as to gold and as to gravel. His decision was upheld by the Interior Board of Land Appeals (IBLA). *United States v. Humboldt Placer Mining Co.*, 8 I.B.L.A. 407 (1972). Appellants then sought judicial review and reversal of the IBLA decision. The district court granted summary judgment in favor of the Secretary and this appeal followed. We affirm.

*Gold*

In support of its contest the United States conducted a comprehensive exploration program on the claims between 1957 and 1961.[1] Four mining engineers and geologists testified before the hearing examiner that as a result of this exploration program they had formed the opinion that on none of the claims had there been a valid discovery of gold of value sufficient to meet the prudent-man test. *See United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968), citing the standards set in *Castle v. Womble*, 19 L.D. 455, 457

---

* Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

1. The hearing examiner said of this program: "Auger holes, churn drill holes, surface channels, pits and trenches were excavated and tested as points which Humboldt in its application for mineral patent has indicated the existence of significant values and which the Contestant's engineers deemed worthy of examination."

(1894): "Where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine."

In support of their claim of gold value, appellants submitted various reports. The hearing examiner acted well within his discretion as a finder of fact in discounting these reports. Some of them were business records of the appellants, written prior to 1942. While they reflected some significant gold values, they were very general. The appellants also submitted a report by Merrill Yost which included some drill logs and contained evidence of high gold values. This evidence, however, was refuted by the appellee's sampling conducted in the immediate vicinity of Yost's excavations and drill holes. Moreover, Yost did not testify and subject himself to cross-examination to support his report, although he was apparently available. In weighing the evidence, the hearing examiner could reasonably have found the appellants' reports to be unpersuasive.

■ Much of appellants' case was based on the fact that the claims were on the Weaverville Formation, the value of which had been established by the success of the LaGrange mine. Discovery must, however, be made on the claims themselves. The LaGrange proximity might indeed persuade a reasonable prospector to continue to search for valuable minerals, but he must succeed in his search before discovery occurs. *Henault Mining Co. v. Tysk*, 419 F.2d 766 (9th Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). The reasonably prudent man we are concerned with is the miner who has made his discovery and not the prospector who is still looking.

Appellants also rely on testimony by Florian Gibson, a geologist, that the claims had high value placer gold deposits. As to this testimony the hearing examiner stated:

"The fantastic gold values reported by Gibson were based on surface samples taken over a five hour period, as contrasted with the extensive exploration program conducted by the Contestant involving several man-years. The samples were assayed by the so-called Douglas process involving the use of unidentified solutions. There is no supporting evidence of the nature of the unidentified solutions or positive evidence of the process by which the gold could be recovered. Gold values averaging one hundred dollars per cubic yard, consisting of either coarse or microscopic particles, would surely be identifiable by normal fire assay. The Douglas tests reflecting average gold values of one hundred dollars per cubic yard, and as high as two hundred dollars gold per cubic yard of material in place, are simply unworthy of belief."

■ Appellants criticized the exploratory work of the government as not extensive enough to establish a lack of value. They assert that the government drill holes should have been extended down to bedrock, where gold is most likely to lodge. Appellants, however, mistake the burden of proof in these cases. The burden of the United States in contesting validity is to make out a prima facie case of lack of value. The burden then shifts to the claimant to show, by a preponderance of evidence, that the claim is valid. *United States v. Springer*, 491 F.2d 239, 242 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 125 (1974); *United States v. Zweifel*, 508 F.2d 1150, 1157 (10th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46, *reh. denied*, 423 U.S. 1008, 96 S.Ct. 438, 46 L.Ed.2d 379 (1975). The United States here undoubtedly had established a prima facie case. If anyone had the burden of going to bedrock it was appellants in order to rebut the case made by the government.

■ The hearing examiner concluded that the United States had made out its prima facie case of lack of value and that appellants had not met the burden of overcoming that case. IBLA, in review, agreed that "the preponderance of credible evidence fails to support a discovery on any of the claims." We agree.

*Gravel*

As to appellants' contention that the claims had value for the gravel deposit, the hearing examiner stated:

"A considerable portion of the Contestees' evidence was devoted to the contention that valuable deposits of sand and gravel occur in the claims. Substantial deposits of material suitable for fill and sub-base in highway construction and more limited deposits of recent stream gravels suitable for use as concrete aggregate do occur on the claims. However, these deposits do not constitute valuable mineral deposits unless they are shown to be marketable. There is not a shred of evidence in the record that there has ever been any demand for the subject sand and gravel deposits, or that any portion thereof has ever been removed from the claims for use in concrete aggregate or for any other purposes. The fact that there is a very limited annual market in small towns in Northern California which have other existing sources of supply, and the possibility of the future construction of highways and dams in the area, do not constitute evidence of a demand for these particular deposits. In the absence of more specific evidence that these particular sand and gravel deposits could have been removed and disposed of at a profit on or before July 23, 1955, it must be concluded that the same do not constitute valuable mineral deposits within the meaning of the mining laws."

IBLA echoed his findings:

"While the record discloses that gravel was an abundant commodity on the claims, there is no evidence of any sales of gravel from the deposits. George W. Nielsen, a mining engineer employed by the Bureau of Land Management and called by appellee, testified that at no time has the Weaverville Formation been mined and processed for the production of sand and gravel. He further testified that the Weaverville Formation, because of weathering, is generally too dirty and too soft to make concrete aggregate, although it could be used for sub-base and fill material. Robert Middleton, a mining engineer called by appellee, testified that he examined the claims, and further testified that no aggregate had been produced from the claims, and that there was no evidence on the ground of any removal.

This evidence was sufficient to establish a prima facie case that the gravel on the claims could not have been marketed at a profit prior to July 23, 1955. * * *

* * * * * *

Appellants, in our view, failed to overcome the prima facie case established by the Government. Their evidence was too vague and inconclusive to establish that locatable gravels from the claims in issue could have been extracted and marketed at a profit prior to July 23, 1955. Moreover, appellants have failed to establish by substantial and probative evidence the existence of a demand for the gravel as of that date *from these claims. United States v. William A. McCall, Sr., et al.,* 2 IBLA 64, 78 I.D. 71 (1971)."

8 I.B.L.A. 411–12.

Appellants, citing *Verrue v. United States,* 457 F.2d 1202, 1204 (9th Cir. 1972), argue that lack of sales of gravel from the claims figures unduly in the findings of the hearing examiner and IBLA to the effect that marketability of the material had not been established. In *Verrue* we held that "positive evidence in the record of marketability" was not offset by evidence of the lack of sales of material and the availability of comparable material from other sources.[2] *Verrue* does not apply here. Here there was no positive evidence of marketability to overcome the government's prima facie case. Further the determination of IBLA

---

2. In *Melluzzo v. Morton,* 534 F.2d 860, 863 (9th Cir. 1976), we construed *Verrue* as "holding that lack or insubstantiality of sales of material from the claims in question is relevant to the question of marketability. It is not, however, conclusive proof of lack of value. The inference to that effect, when all evidence is considered, can be found to have been overcome by evidence of marketability."

that the government had made out a prima facie case of lack of discovery was supported by testimony disparaging the quality of the gravel on the claims.

Appellants protest that the decision of IBLA respecting quality of the gravel is flatly contrary to a finding proposed by appellants and adopted by the Board. That finding reads:

"Finding No. 6. Sand and gravel on the claims is a source of concrete aggregate. (Tr. 449, Scarfe). The gravels are a source of impervious material of good quality, which can be used commercially for construction and road purposes. (Tr. 499)."

The first record citation is apparently an error. The second has reference to the following testimony of government witness, George Scarfe, on cross-examination:

"Q Now, do you agree with this statement that: 'Sand and gravel deposits along the Trinity River and Stuart's Fork are being considered as sources for concrete aggregate for the Trinity and Lewiston Dams and tunnel lining, while gravels which occur upon land contained in the above Placer Mining locations are being considered as the sources to the required impervious embankment material for the Fairview Dam.'

Do you agree with this statement that the material on these claims among which are those that you examined are suitable for this particular purpose?

A They said they are being considered. I agree, well, I have no reason to disagree. I hadn't seen this report."

Finding No. 6 is to be read as a paraphrase of this testimony; it is the only construction supported by the record. So construed we do not find it to conflict with the Board's decision. *See Ideal Basic Industries, Inc. v. Morton*, 542 F.2d 1364, 1368–70 (9th Cir. 1976).

Judgment affirmed.