**Frank MELLUZZO and Wanita Melluzzo, Plaintiffs-Appellants,**

v.

**Rogers C. B. MORTON, Secretary of the Department of the Interior of the United States of America, Defendant-Appellee.**

No. 74–2683.

United States Court of Appeals, Ninth Circuit.

April 15, 1976.

Hale C. Tognoni (argued), Phoenix, Ariz., for plaintiffs-appellants.

Jacques B. Gelin (argued), Dept. of Justice, Washington, D. C., for defendant-appellee.

OPINION

Before MERRILL and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

MERRILL, Circuit Judge:

This appeal is taken from judgment of the District Court for the District of Arizona upholding a final administrative decision of the Secretary of the Interior which held invalid six placer mining claims of appellants—the Rena group (Nos. 1 to 6), near Phoenix, Arizona—on the ground of lack of discovery of a valuable mineral deposit. The Secretary's decision is published at 76 I.D. 160 (1969).

The deposits claimed were of sand, gravel and building stone. The Secretary held these to be "common varieties" under § 3 of the Act of July 23, 1955, 30 U.S.C. § 611, and not subject to mining location after the date of the Act. The Act provides:

"No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: * * 'Common varieties' as used in sections 601, 603 and 611 to 615 of this title does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value * * *."

In the administrative hearing and on this appeal, appellants contend that the deposits possessed characteristics giving them distinct and special value, and thus excluding them from the effect of the 1955 Act. As to the gravel deposits, they rely on testimony in general to the effect that the quality of the gravel was better than that of other such material in the area—that it was superior with respect to gradation, cleanliness and reactivity. The Secretary concluded:

"The degree of superiority of Rena materials in these respects is hardly indicated to be of such magnitude as to warrant the conclusion that the Rena deposits possess unique properties which would set them apart as uncommon varieties."

As to building stone, the Secretary concluded that it was so plentiful in the Phoenix area as to make it undistinguishable from the building stone in *United States v. Coleman*, 390 U.S. 599, 603–04, 88 S.Ct. 1327, 1331, 20 L.Ed.2d 170, 175 (1968), of which the Court stated:

"We believe that the Secretary of the Interior was also correct in ruling that '[i]n view of the immense quantities of identical stone found in the area outside the claims, the stone must be considered a "common variety"' and thus must fall within the exclusionary language of § 3 of the 1955 Act * * *."

We cannot say that the Secretary's decision in these respects is not founded on substantial evidence.

* Honorable Russell E. Smith, Chief U. S. District Judge for the District of Montana, sitting by designation.

■ The question, then, is whether prior to July 23, 1955, the deposits discovered were "valuable mineral deposits" under 30 U.S.C. § 22. The recognized test is the "prudent-man test" (whether the deposits were of such a character as to justify a man of ordinary prudence in expending further labor and means with a reasonable prospect of success in developing a valuable mine); as complemented by the "marketability test" (whether the mineral could be extracted and marketed at a profit). *United States v. Coleman, supra.*

On this question the Secretary stated:

"The evidence is overwhelming that there was no market for the sand and gravel from the claims prior to July 23, 1955. McDonald testified that there were closer sources which supplied what demand there was in the area, that it would have been economic folly to open a pit at the Rena locations except for some local road building in the immediate area, and that a market did not develop until the 1960's. Another Government witness placed the current main market at about an equal distance from the Rena claims and the Salt River deposits and said the New River deposits are closest to the northern market. These other deposits have almost all been in operation for over 20 years and there has never been a shortage. Obele testified to Union's operating pit on 19th Avenue, 4 miles north of Northern Avenue and 6 miles south of the Rena claims. He also referred to at least 8 plants on the Agua Fria and 2 on New River. All of these pits produce materials which, with varying degrees of processing, can be used as concrete aggregate. Obele said the market north and east of Phoenix (toward the Rena claims) developed significantly in the last 4 years; he had no knowledge of the situation prior to 1959.

The Rena material was first developed on a large scale between March and December 1962 by the Allstate Materials Company, 7 years after the critical date. 20,000 to 30,000 tons were removed from the pit which was on the Rena No. 4. The only evidence as to any development prior to July 23, 1955, was Melluzzo's uncertain testimony that 600 tons of sand and gravel, mostly sand, were sold commencing in December 1954. He used about 100 tons for houses he was building and Shorty Rutter took 500 tons for which he paid $.25 per yard, he thought. This very limited disposal of sand and gravel, apparently for limited local use, falls short of establishing that the Rena sand and gravel could have been extracted and sold at a profit as of July 23, 1955. On the contrary, the market was adequately supplied by much closer regularly operated commercial pits." (footnotes and citations to the record omitted).

Appellants contend that the Secretary improperly relied on lack of sales from the Rena claims contrary to the decision of our court in *Verrue v. United States,* 457 F.2d 1202 (9th Cir. 1972).[1] In that case we held that lack of evidence of sales of material from the claims involved, together with evidence of an abundance of similar material in the area, did not suffice to overcome a showing of value. *See also United States v. Gibbs,* 13 I.B.L.A. 382 (1973).

*Verrue* was not the last word of our court on this subject. In *Clear Gravel Enterprises, Inc. v. Keil,* 505 F.2d 180, 181 (9th Cir. 1974), we stated:

"While the marketability of the mineral could have been demonstrated by the Appellant by a showing of its accessibility, its proximity to the market, the demand for it and by the Appellant's bona fide efforts to develop the claims and compete in the market with the product extracted from those claims, nonetheless,

---

1. Appellants further contend that the Secretary relied on the fact that the demand for gravel and sand was adequately met by presently operating pits, contrary to the decision of this court in *Barrows v. Hickel,* 447 F.2d 80 (9th Cir. 1971). As to this contention, the sources to which the Secretary referred had the advantage of proximity to the demand, see note 3, *infra,* and thus raised a question as to whether increased transportation costs would allow for a profitable market for the Rena material, a subject we discuss later.

the record demonstrates that Appellant's evidence fell far short of the required showing."

We noted that no sand or gravel had been taken from the claims in question and that the market was being adequately supplied by the one pit in operation.

■ *Verrue* did not hold that the facts of lack of sales and abundance of material from other sources were irrelevant to the question of marketability. It held that under the circumstances of that case these facts could be, and were, overcome by "positive evidence in the record of marketability." 457 F.2d at 1204. *Clear Gravel* presented the opposite evidentiary situation. There government evidence was to the effect that the material from the claims in question could not have been marketed at a profit. We construe the two cases together as holding that lack or insubstantiality of sales of material from the claims in question is relevant to the question of marketability. It is not, however, conclusive proof of lack of value. The inference to that effect, when all evidence is considered, can be found to have been overcome by evidence of marketability.

■ In this respect *Verrue*, at 1203, quotes *Barrows v. Hickel*, 447 F.2d 80, 82 (9th Cir. 1971), to the effect that "actual successful exploitation of a mining claim is not required to satisfy the 'prudent-man test.'" *Verrue* makes it plain that the claimant need not rely on his own successful marketing efforts to prove marketability of his material. If the successful marketing by others has sufficiently established that the claimant's comparable material is itself marketable, that can suffice.[2]

But there is more to proof of marketability than proof that there was a local market for sand and gravel. The claimant must establish that his material was of a quality that would have met the existing demand and that it was marketable at a profit. As to the matter of quality, appellants would appear to have no problem. As to the matter of profitable marketing, questions remain.

■ In discussing the marketability test in *United States v. Coleman, supra*, 390 U.S. at 602, 88 S.Ct. at 1330, 20 L.Ed.2d at 175, the Court stated:

"Minerals which no prudent man will extract because there is no demand for them at a price higher than the costs of extraction and transportation are hardly economically valuable."

It is the market value of the material above cost of extraction and transportation (including labor) with which we are concerned. For the material to be regarded as economically valuable the market price must include such a value or profit element or

2. *Verrue*, in this, follows *Barrows v. Hickel, supra*, where we stated:

"Noting the Secretary's emphasis on the fact that until 1960 Barrows was a 'small operator' who had only a small part of the market, appellant contends that the Secretary improperly required a showing of substantial profit in the limited market that was left over after established operators had had their share. The effect of the Secretary's decision, appellant asserts, is to encourage monopolization at the expense of small mining operators.

\* \* \* \* \* \*

We agree that a claimant's ability to meet the 'marketability test' cannot be made to depend on the extent of the market not already preempted by established operators." 447 F.2d at 82. This was echoed in *United States v. Gibbs, supra*, 13 I.B.L.A. at 392–93, where the Secretary stated:

"In the affluent, business oriented American society, well served by inter-connected transportation systems, almost all normal consumer demand is somehow supplied. This has never indicated that the market was closed to competition, particularly if the emerging competitor could offer lower prices, better quality, faster delivery, or other inducements. The mere fact that the needs of a particular locality may be fully supplied by one or more gasoline stations, grocery stores, restaurants or lumber yards in no way foredooms the efforts of those who would attempt to capture a portion of those markets. This issue should now be resolved by the pronouncement of the Court in *Barrows v. Hickel, supra*, which held that the claimant's ability to meet the marketability test cannot be made to depend on the extent of the market not already preempted by established operators."

increment, and it is that increment attributable to the material itself (rather than to the labor and equipment involved in producing and transporting it to the market) that must prove attractive to the prudent man.

Two profit factors can be drawn into question in considering whether a claimant's material, although it had not been marketed at a profit, nevertheless could have been marketed at a profit:

■ 1. The cost factor. It must appear that the cost of extraction, preparation for market and transportation to market will, in the claimant's case, provide a value increment or profit comparable to that which attaches to the material being successfully marketed by others.[3]

2. The demand factor. It must appear that the local demand was able to absorb additional material such as the claimant's and still permit an attractive profit to be realized. It is for that profit that the newcomer, under *Barrows*, must be permitted to compete. In order to ascertain whether a demand existed for hitherto unmarketed material a hypothetical market must be created in which the new material plays its part. If the profitability of the market for such material is realistically to be ascertained by setting the factor of demand opposite that of supply, the new material must be included with that from all other known potentially competitive sources in calculating the factor of supply.[4] If supply so calculated amounts to a superabundance and so overwhelms the existing demand as to reduce the value or profit increment to a level below that which would prove attractive to a prudent man, the material cannot be said to be marketable at a profit.[5]

■ *Barrows, Verrue* and *Clear Gravel* were decided after the decision of the Secretary was handed down in this case and the critical questions we have noted did not have attention of the hearing examiner or on administrative review. No explicit determination was made as to whether differentials in proximity to a commercially attractive market would have so affected cost factors as to preclude reliance by appellants

3. The Secretary quotes the hearing examiner to this effect:

"The evidence relating to marketability on behalf of the contestant established that there were numerous sources of supply for sand, stone, and gravel much closer to the Phoenix metropolitan area than the Rena group in 1955; that all of the deposits were usable for the same purposes; and that one of the major elements in determining the value of a deposit of such materials is its proximity to the demand."

Appellants contend that the record does not bear out this finding with respect to proximity. They concede that the metropolitan Phoenix market in 1955 was being supplied by deposits which were closer to the market than were the Rena claims. This metropolitan Phoenix market was by witnesses placed south of Northern Avenue and accounted for 85 percent of the local demand. The Rena claims are twelve miles north of Northern Avenue. Appellants argue that the record thus gives them the 15 percent of the local market that was north of Northern Avenue, as to which the Rena deposits had the advantage of proximity over the other deposits.

But the Rena deposits were not alone in their potential for serving the northern market. It was also being supplied by Union Sand & Rock and other producers on the Agua Fria and on New River. Testimony is to the effect that the New River deposits were closest to the northern market; that Union's pit was six miles south of Rena and thus closer to the main metropolitan market. Appellants argue that if the northern market itself is divided geographically the Rena claims would have the advantage of proximity as to the eastern quadrant. But the record gives no indication as to the extent of the market in that quadrant and the extent to which it would have attracted a prudent man in 1955.

4. A hypothetical market in which the claimant's material is the only unmarketed material taken into account is hardly a useful supposition. If claimant's material can be marketed, then so can that from all potentially competitive sources. To exclude all unmarketed material save that of the claimant could result in the unrealistic conclusion that all such material, considered claim by claim, is marketable at a profit notwithstanding the fact that if the claims had all been actively operated none could have done so profitably.

5. If the newcomer fails to establish marketability under this test, it would not be due to preemption of the market by established operators (reliance on which is precluded by *Barrows*), but because of the total amount of material available and the limited demand for it.

on the marketability of comparable material by others, or would have robbed the Rena material of any such value increment as would have proved attractive to a prudent man in 1955. We do not know from this record whether any such decision could have been made on the evidence presented. Conclusions of witnesses appearing in the record may suggest the answer, but the factors on which such conclusions are based do not sufficiently appear. The same may be said of the decision that the local demand in 1955 could not absorb the Rena material. We feel that the fairest solution is to remand for further consideration, or, in the discretion of the Secretary, for further hearing in the light of *Barrows, Verrue* and *Clear Gravel*, and of the views here expressed.

What has been said has been directed largely to the value attributable to the sand and gravel deposits. We feel, however, in the light of the quotation from the hearing examiner on which the Secretary relied (note 3, *supra*), that for the same reason it applies as well to the building stone.

■ Judgment is affirmed in so far as it upholds the decision of the Secretary that the deposits on the Rena claim were common varieties. In so far as it upholds the decision of the Secretary that the deposits did not constitute valuable mineral, judgment is reversed and the case is remanded with instructions that it be remanded to the Secretary of the Interior for further proceedings.

No costs are allowed.