CHARLESTONE STONE PRODUCTS
CO., INC., a corporation,
Plaintiff-Appellee,

v.

Cecil D. ANDRUS, Secretary of the Interior,* and United States of America,
Defendants-Appellants.

No. 75–1532.

United States Court of Appeals,
Ninth Circuit.

May 12, 1977.

---

* Rogers C. B. Morton, as Secretary of Interior, was the originally named Secretary. We note the name of his present successor in office.

Larry A. Boggs, Appellate Section, Land & National Resources Division, Dept. of Justice, Washington, D. C., argued for defendants-appellants.

W. C. Lamoreauz, Salt Lake City, Utah, argued for plaintiff-appellee.

Before TRASK and GOODWIN, Circuit Judges, and EAST,** District Judge.

EAST, Senior District Judge:

*The Cause:*

Cecil D. Andrus, for the defendants-appellants, as Secretary of Interior, (Secretary) appeals the judgment of the District Court holding valid and granting access to certain placer sand and gravel mining claims located in the Las Vegas Valley in Nevada. We affirm.

The Secretary on November 17, 1965 initiated a contest complaint against the plaintiff-appellee Charlestone Stone Products Co., Inc. (Charlestone), attacking the validity of Charlestone's placer mining locations for sand and gravel numbered 1 through 22 and numbered 12A and 13A.[1] The Administrative Law Judge found Claims 9 and 10 to be valid. On cross-appeals, however, the Secretary's Board of Land Appeals (Board) found only Claim 10 to be valid. Upon judicial review, the District Court, believing an injustice had been accomplished, held that "at least the claims 1 through 16" were valid. It also held that Charlestone should be granted access to Claim 22 in order to utilize, in the operations of the valid claims, the water produced from a well driven on Claim 22.

*Issues on Review:*

While the Secretary asserts the issues on review in different terms, we deem the pertinent issues to be:

(1) Whether, upon construing the record as a whole, the Secretary's finding that only Claim 10 was valid is supported by substantial evidence. *Multiple Use, Inc. v. Morton,* 504 F.2d 448, 452 (9th Cir. 1974); *White v. Udall,* 404 F.2d 334, 335 (9th Cir. 1968); and *Henrikson v. Udall,* 350 F.2d 949, 950 (9th Cir. 1965), *cert. denied,* 384 U.S. 940, 86 S.Ct. 1457, 16 L.Ed.2d 1538 (1966).

(2) Whether Charlestone met the two prong test of establishing: (a) A discovery of a valuable deposit of sand and gravel on each of its claims; and (b) The intrinsic value of the sand and gravel deposits was such as "would justify a person of reasonable prudence in making further expenditures upon the property with a reasonable prospect of success in developing a valuable

---

** Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. Claims numbered 12A and 13A located after the year 1955 are not in issue.

mine.[2] *United States v. Coleman,* 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 . . . (1968)." *Clear Gravel Enterprises, Inc. v. Keil,* 505 F.2d 180 (9th Cir. 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 87 (1975); and *Verrue v. United States,* 457 F.2d 1202, 1203 (9th Cir. 1972). "The reasonably prudent man we are concerned with is the miner who has made his discovery and not the prospector who is still looking." *Humboldt Placer Mining Co. v. Secretary of Interior,* 549 F.2d 622, 624 (9th Cir. 1977).

*Filing and Operations of Claims :*

Pursuant to the existing statute, A. M. Murphy and Fred Pine (Murphy) filed placer mining claims numbered 1 through 22 on February 18, 1942 in a surface water wash of the Las Vegas Valley some 15 miles distant from the then center of the city of Las Vegas. The aggregate acreage of the several claims approximated 450 acres and contained a later estimated 20 million cubic yards of sand and gravel.

The evidentiary record is replete with eyewitness testimony that the sand and gravel contained in the area of the claims was of excellent quality for various construction uses and had value as such.

Shortly after the location and filing of the claims, Murphy's assignee, Southern Nevada Industries, Inc. (Southern), began operation within the confines of the claims and removed some 100,000 yards of material from a number of places up and down the wash. Due to the absence of washing water, Southern transported the raw materials to a site some five miles distant for crushing, screening, and washing. The refined material was used in the construction of an air force base situated northeast of Las Vegas. Southern closed the operation in 1943 and moved to an area near Henderson, Nevada for participation in a World War II construction project in that area. Thereafter, during the remainder of World War II and its aftermath, private construction in the area was curtailed.

From September, 1954 until during the year 1957, one E. H. Brawner (Brawner), as lessee of the claims, operated under a royalty agreement of not less than $200 per month. It is undisputed that at this time Brawner's sand and gravel operation was farther from Las Vegas than were the operations of his competitors. Brawner's operation was also hampered to some extent by the absence of a water supply. Nevertheless he continued to operate the crushing plant within the limits of Claim 10 and materials were extracted from the crusher area and "pit" located within that claim and from other claims in the canyon. The market demand for the various types of sand and gravel, together with the lay of the various materials, dictated the location of the extractions. Brawner made profitable sales of the extracted materials through the year 1957.

The foregoing narration carries the operation on the claims through the critical pre-July 23, 1955 discovery period.[3] The following narration of operations subsequent to July 23, 1955 is pertinent, first, to the extent that the facts might bear upon the proper application, at the time of the contest proceedings, of the two prong "value" and "prudent man" or marketability test enunciated above; and, secondly, to the continuity of the marketability of the extracted materials.

2. That is, whether the sand and gravel "in question could be extracted, removed and marketed at a profit on . . . July 23, 1955 when common variety sand and gravel deposits as here involved became no longer locatable. 30 U.S.C. § 611. *United States v. Barrows,* 404 F.2d 749 (9th Cir., 1968), *cert. denied,* 394 U.S. 974, 89 S.Ct. 1468, 22 L.Ed.2d 754 . . . (1969)." *Clear Gravel Enterprises, supra* at 180–81.

Section 611, in its pertinent parts, reads: "No deposit of common varieties of sand, stone,

gravel . . . shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: *Provided, however,* That nothing herein shall affect the validity of any mining location based upon discovery of some other mineral occurring in or in association with such a deposit."

3. See note 2, *supra.*

On April 9, 1959, Frank R. Sullivan obtained title to the claims, extracted materials which were later stockpiled on the property, and sold some of the material as roofing granules.

On January 5, 1960, Charlestone acquired title to the claims and during 1961 Morrison-Knudsen, Inc., as lessee, entered the claims, constructed a screening plant within the confines of Claim 10 and carried on processing operations. Unsuccessful efforts were made to drill screening water wells within Claims 9 and 10, and in 1962, at the cost of some $3,000, a well supplying adequate washing water was located within Claim 22. On July 15, 1964, Charlestone leased Claims 1 through 16 to Arden Sand and Gravel Co. (Arden) for a period of five years with an annual royalty of $12,000. Although Charlestone retained Claims 17 through 22, it agreed to furnish Arden with electrical power and washing water from the well within Claim 22.

*Action of the Secretary :*

During the summer of 1956 while the Brawner operations were in progress, the United States Bureau of Land Management in Nevada employed Messrs. Hill and Lovejoy (Hill), competent engineers and surveyors, to investigate the validity of the instant claims. Hill reported that Claims 1 through 22 encompassed a valuable discovery of sand and gravel deposits and were valid. The report constituted a comprehensive and informative discussion of the factors bearing upon a determination of marketability of sand and gravel deposits and of the quality of particular sand and gravel deposits as of July 23, 1955. After submission of the Hill report, the Bureau of Land Management affirmed the validity of the Brawner claims and removed the area of the claims from an open small tract classification.

Nine years later the Secretary employed Donald G. Fisher (Fisher),[4] a mining engineer, to investigate and report on the validity of the Charlestone claims. Fisher gathered hearsay information from competing sand and gravel operators in the area and made a visual examination of the claims in 1965, some ten years after the crucial date of July 23, 1955. Based upon his investigation, Fisher opined that *all* of the Charlestone claims were invalid for want of a discovery. The Secretary then used the Fisher report as a basis for the contest proceedings.

*Administrative Proceedings :*

Fisher was the Secretary's sole witness and his testimony comprised the only evidence in support of the contest. Fisher testified to the effect that his opinion was based upon information gained as a result of visual examination of apparent extractions from each of the claims in 1965 and again in 1969; review of all mineral reports, as well as the Hill report; and interviews with local sand and gravel dealers, including the present owners and the past operators of the claims. Further, he testified that his opinion was also based upon his familiarity with the Las Vegas area, where he had previously been employed by the Government in making validity determinations and market studies in mining contest cases. Fisher, using his version of the test of discovery, opined that "this was a very sporadic operation . . . [I]t didn't appear to be an operation that could sustain a continuous operation over the years" and the claims were invalid for want of discovery. In his opinion, the crucial factors in the invalidity of the claims were the excessive distance of the claims from a market and the lack of washing facilities.

To rebut Fisher's testimony, Charlestone produced the deposition testimony of Hill. Hill's testimony reaffirmed the conclusion in his 1956 report that all of the claims were valid. He testified that his opinion of validity was based upon a personal inspection of the claims, an investigation of the actual history of the operation of the claims, and his knowledge of the marketability of the product resulting from the

---

4. Fisher had been previously employed by the Secretary in connection with other contests of sand and gravel claims within the Las Vegas vicinity.

thorough study he had made in conjunction with Mr. Lovejoy.

Charlestone buttressed Hill's conclusions with the eyewitness testimony of several workers who had been employed at the extraction operations by Southern and Brawner.[5]

The decisions of the Administrative Law Judge and the Board reflect that each gave substantial weight to Fisher's testimony. At the conclusion of the hearing, the Administrative Law Judge found only two of the 22 claims to be valid. On administrative review, the Board, placing even more credence on Fisher's opinion, found only one of the claims to be valid. Charlestone ultimately and successfully sought review of the latter decision in the District Court.

*Discussion and Disposition :*

*Issue 1 :*

■ We conclude that the Board's exclusion of validity of Charlestone's claims, except as to Claim 10, is not supported by substantial evidence.

Our conclusion is, first, guided by the course set in *Walker v. Mathews,* 546 F.2d 814, 818 (9th Cir. 1976):

"Substantial evidence means that a finding is supported by ' "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' (*Richardson v. Perales* (1971) 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842). In applying the substantial evidence test we are obligated to look at the record as a whole [6] and not merely at the evidence tending to support a finding."

Footnote 6 reads:

"*See, Day v. Weinberger* (9th Cir. 1975) 522 F.2d 1154, 1156 ('But in determining whether there is substantial evidence to support the examiner's finding a reviewing court must consider both evidence that supports, and evidence that detracts from, the examiner's conclusion. We cannot affirm the examiner's conclusion simply by isolating a specific quantum of supporting evidence.'); Davis, 4 Administrative Law Treatise § 29.03 (1958) (' ". . . Evidence which may be logically substantial in isolation may be deprived of much of its character or its claim to credibility when considered with other evidence." '); and *Universal Camera Corp. v. N.L.R.B.* (1951) 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456."

Secondly, "opinions not supported by facts, and which are contrary to the physical facts and do violence to scientific principle or reason, are robbed of all probative value." *Weinberg v. Northern Pac. Ry. Co.,* 150 F.2d 645, 651 (8th Cir. 1945). *See Anderson v. Knox,* 297 F.2d 702, 719–20 (9th Cir. 1961); *United States v. Honolulu Plantation Co.,* 182 F.2d 172, 178 & n.15 (9th Cir. 1950); and *United States v. 102.93 Acres of Land, Etc.,* 154 F.Supp. 258 (E.D.N.Y.1957), *aff'd sub nom. United States v. Fox,* 257 F.2d 805 (2d Cir. 1958).

Finally, this Court has in the past refused to credit the testimony of Government witnesses on facts similar to those in the case at bar. In *Verrue, supra,* this Court affirmed the District Court's reversal of the Secretary's decision invalidating a sand and gravel mining claim for lack of discovery of a valuable mineral deposit. In reaching this conclusion, the Court noted that the crucial issue was marketability and that the testimony of the three Government witnesses "sheds no light on that issue" because none of them had been in the area of the mining claim during the crucial period "nor did any one of them have personal knowledge of the sand and gravel market during that time." *Id.* at 1204.

Fisher's opinion, on which the Secretary exclusively relies, neither avoids the inadequacies noted in *Verrue, supra,* nor is it

---

5. The record establishes actual sales from the claim sites and constitutes an even stronger showing of marketability than was made in either *Melluzzo v. Morton,* 534 F.2d 860 (9th Cir. 1976), or *Verrue, supra.* In those cases, this Court, notwithstanding a total absence of sales from the claim sites, reversed decisions of the Secretary that certain sand and gravel claims were invalid.

supported by the other facts in the record. It was based upon an investigation begun more than ten years after the close of the crucial period. Although he stated he was familiar with the Las Vegas area, there was no indication that he was familiar with that area during the crucial period. In addition, his opinion was not based upon personal knowledge of the sand and gravel market during that period. Rather, he gleaned his information solely from a visual inspection of the terrain, a review of reports and interviews with others, all conducted more than ten years after the crucial period. More importantly, his opinion was flatly contradicted by the Hill report which was based upon an investigation completed within one year of the crucial period and also by direct evidence of marketability supplied by persons who had actually witnessed substantial recoveries from the claims up and down the valley or wash. In light of these factors, we must conclude that the Board improperly credited Fisher's unfounded opinion of nonvalidity.

*Issue 2–(a)*:

A discovery of valuable sand and gravel deposits on Claims 1 through 22, containing workable deposits of sand and gravel of like character and quality with the material in Claim 10, is clearly established by the record.

*Issue 2–(b)*:

■ The marketability of the pre-July 23, 1955 extractions can be tested by reason of: (1) Accessibility to the claims; (2) Bona fides of the operators in developing the claims; (3) Existence of market demand within reasonable proximity to the claims; and (4) Actual participation in the market. *See Clear Gravel Enterprises, supra* at 181.[6]

The relevant evidence in the record establishes that:

(1) Accessibility of Charlestone's Claims 1 through 22 was readily available. The area of the wash was not remote but, to the contrary, readily available to major public roads;

(2) Charlestone's predecessors in interest made a bona fide development and recovery of various grades of sand and gravel from within the several claims during the pre-July 23, 1955 period;

(3) Market demand existed for the extracted grades of sand and gravel within reasonable proximity to the various claims; and

(4) The predecessors actually sold the recovered material in that market.

The evaluation as to whether Charlestone met tests (3) and (4) deserves further comment. Fisher's opinion of nonvalidity was based primarily upon: (a) An absence of washing water; (b) The sporadic operations of Southern and Brawner; and (c) The prohibitive distance of the claims from the market. We are convinced that each of those reservations was nullified by the only relevant evidence in the record.

The evidence established that Southern and Brawner did actually recover sand and gravel from the claims, transported those extractions for washing and sold the same on the market.

■ The seemingly sporadic operations by Southern and Brawner were a mirror of the building and construction industry in the Las Vegas area during and shortly after World War II. Continuous operation of a placer mining claim is not a per se requisite to proving the validity of that claim. Ces-

---

**6.** Contrast with the holding in *Humboldt Placer Mining Company v. Secretary*, 549 F.2d at 625 (9th Cir. 1977), where this Court reemphasized its holding in *Verrue, supra*, that " 'positive evidence in the record of marketability' was not offset by evidence of the lack of sales of material and the availability of comparable material from other sources.2"
Footnote 2 reads: "In *Melluzzo v. Morton*, 534 F.2d 860, 863 (9th Cir. 1976), we

construed *Verrue* as 'holding that lack or insubstantiality of sales of material from the claims in question is relevant to the question of marketability. It is not, however, conclusive proof of lack of value. The inference to that effect, when all evidence is considered, can be found to have been overcome by evidence of marketability.' "

sation of operation of any economic enterprise may be caused by innumerable factors totally beyond the bona fide intentions of the operator. Reason dictates that periodic cessation of operation of a placer mining claim, short of an intentional abandonment of the claim, need not defeat ultimate proof of validity.

Since a total absence of operation does not preclude a finding of validity (*Verrue, supra*), it follows that sporadic operation does not preclude a finding for validity. The Secretary does not contend there was a pre-July 23, 1955 abandonment of the claims by Brawner. In fact, as of July 23, 1955, Brawner was engaged in the profitable extraction of sand and gravel from the various claims.

The Fisher postulate of an excessive distance of the claims from the market is meaningless. Some competitors in the sand and gravel business are next door to a construction project; yet a distant competitor underbids and successfully competes with the next door neighbor. The inescapable fact is that market demand supported the recovery and sale of material from the claims.

The prudent person test has enough flexibility to allow a sand and gravel business operator to undertake an apparently marginal enterprise if it has a reasonable possibility of success. Relying on Fisher's opinion, the Secretary deemed Brawner to have been a foolhardy operator; yet in many circles, pre-July 23, 1955 Las Vegas area entrepreneurs would have been deemed astute.

Finally, we conclude that the District Court's finding that "at least the claims numbered 1 through 16 have been proved valid" is not clearly erroneous. Fed.R. Civ.P. 52(a).

Furthermore we agree with the District Court's conclusion that Charlestone must be permitted access to Claim 22 in order to utilize the water recovered from the well in the operation of the other valid claims. However, we reach our conclusion upon a rationale other than that relied upon by the District Court.

It is agreed that the Murphy location notices were lawfully filed under the Acts of Congress. Each of the location notices, covering Claims 1 through 22, described a "piece of mineral bearing ground as a Placer claim" as distinguished from a claim location of any particular mineral, either surface or underground, within that tract of ground. "A placer location is the location in accordance with those acts [of Congress] of a tract of land for the mineral bearing or other valuable deposits upon or within it that are not found in lodes or veins in rock in place." *Webb v. American Asphaltum Min. Co.*, 157 F. 203, 204 (8th Cir. 1907). *See also* 1 American Law of Mining § 5.10 (1976).

We are satisfied that Charlestone, as Murphy's successor, had the right to appropriate and utilize as a mineral the water within any of the claims which met the above two prong test of value and success in development. It has been said that " 'Mineral' is a word of general language, and not *per se* a term of art. . . . It is not capable of a definition of universal application, but is susceptible to limitation or expansion according to the intention with which it is used in the particular . . . statute." *Bumpus v. United States*, 325 F.2d 264, 266 (10th Cir. 1963).

Since early times, water has been regarded as a mineral. "[T]he term 'mineral' has been held to embrace water, particularly subterranean water, irrespective of the character and quantity of salts and gases which may be in solution." 58 C.J.S. *Mines & Minerals* § 2(7) (1948). (Footnotes omitted). Water itself may be classified as a mineral. *United States v. Union Oil Co. of California*, 549 F.2d 1271, 1273 (9th Cir. 1977).

The pertinent Acts of Congress which allow a prospector to enter and patent placer claims for valuable minerals do not expressly define water as a non-mineral. In *Union Oil Co., supra* at 1273 this Court hazards that "Congress was not aware of geothermal power when it enacted the

Stock-Raising Homestead Act in 1916; it had no specific intention either to reserve geothermal resources or to pass title to [the Stock-Raisers]." It is common knowledge that the successful recovery of many "hard" minerals from the earth and the utilization of the soft mineral of water therewith go hand in hand. 1 American Law of Mining § 2.71 (1976). Therefore, it would be incongruous for us to hazard that Congress was not aware of the necessary glove of water for the hand of mining and therefrom Congress impliedly intended to reserve water from those minerals allowed to be located and recovered. In any event we decline to do so.

The limitation in 30 U.S.C. § 611 on the location of claims for common varieties of certain named minerals does not apply to water. In fact, the express language of § 611 exempts from its operation "some other mineral occurring in or in association with such deposit." Therefore, it is of no importance that the discovery of water within Claim 22 occurred after July 23, 1955.

The water recovered from the source under Claim 22[7] undeniably has an intrinsic value in the desert area. There is by the nature of Charlestone's operations no evidence of a profitable market of the water per se for either domestic or irrigation uses. Nevertheless the only relevant evidence in the record demonstrates the existence of a profitable market of the water as a washing agent for the sand and gravel recovered from the valid claims. Although unwashed sand and gravel has a limited market, good quality sand and gravel in combination with water draws a premium market.

We are satisfied that Charlestone has shown a profitable market for the water recovered upon Claim 22 and its claim for the extraction of that water is valid.

The judgment of the District Court entered on November 8, 1974, vacating the decision of the Board dated January 18, 1973 and remanding the cause to the Secre-

tary is affirmed, and the cause is remanded to the District Court for further order of remand to the Secretary consistent with the foregoing.

AFFIRMED AND REMANDED.

---

7. The District Court noted that the source of water under Claim 22 was present on the date of Murphy's notice of location.