**R.E. RODGERS and Barbara Rodgers, Plaintiffs-Appellants,**

v.

**James G. WATT, Secretary of the Interior, Defendant-Appellee.**

No. 80–3482.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 16, 1983.

Decided Feb. 28, 1984.

14.  *See* Comment, *supra* note 7 at 658.

Roger Tilbury, Portland, Or., for plaintiffs-appellants.

Thomas C. Lee, Asst. U.S. Atty., Portland, Or., Dirk D. Snel, Maria A. Iizuka, Washington, D.C., for defendant-appellee.

Before BROWNING, WALLACE, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Appellants, R.E. Rodgers and Barbara J. Rodgers (the Rodgers), appeal from the district court's grant of the government's motion for summary judgment. In accepting the recommendation of the magistrate, the district court sustained an administrative decision by the Department of the Interior declaring five of the appellants' mining claims null and void, because discovery of a valuable mineral deposit was not made prior to the land's withdrawal from operation of the mining laws. On appeal, the Rodgers argue that the Administrative Law Judge (ALJ) and the Interior Board of Land Appeals (IBLA) applied an incorrect legal standard for determining the validity of the claims and that the record lacks substantial evidence to support a prima facie case by the government.

We must view the record as a whole to determine whether substantial evidence supports the ALJ and IBLA decisions. *Verrue v. United States*, 457 F.2d 1202, 1204 (9th Cir.1972). We find that it does not and reverse the district court's summary judgment order.

## FACTS

On November 29, 1967, a seven-square-mile area of basaltic rock in Lake County, Oregon, known as the Sunstone Area, was classified as open to the mining and mineral leasing laws. 32 Fed.Reg. 16285 (1967). In August and September, 1970 six claims were located in the Sunstone Area.[1] On October 8, 1970, the government withdrew the land from operation of the general mining laws, 35 Fed.Reg. 15855 (1970), and on June 18, 1973 the Bureau of Land Management (BLM) filed complaints contesting the four claimants' mining claims.[2]

---

1. R.E. Rodgers located the Bytownite # 1 on August 3, 1970; George and Helen Marshall located the Sun Queen # 1 on August 19, 1970, and the Sun Queen # 2 on September 12, 1970; Don Sellers and R.E. and Barbara Rodgers located the Spectrum # 1 on September 15, 1970; and Truman Mitchell located the Clay Matt # 1 and # 2 on September 26, 1970.

2. Prior to the contest hearing on June 25, 1975 the Rodgers purchased the Clay Matt # 1 and # 2, the Spectrum # 1, and the Sun Queen # 1 and # 2.

The complaints alleged that prior to October 8, 1970 (1) insufficient quantities of minerals had been found on the claims to constitute a valid discovery, and (2) the material discovered on the claims was not a valuable mineral. The ALJ and IBLA held all claims except the Bytownite # 1 claim null and void for lack of a discovery of valuable minerals prior to October 8, 1970. The ALJ held the Bytownite # 1 claim was a valuable mineral discovery prior to October 8, 1970. All charges against that claim were dismissed.

The basaltic rock in the Sunstone Area contains varying amounts of phenocrysts of calcic labradorite, the mineral for which the six claims were located. Calcic labradorite is a mineral of the plagioclase feldspar series with a high calcium content, and varies from transparent colorless to yellow, pink, red and green, with or without a schiller effect. The phenocrysts vary in size from microscopic to larger pieces that can be cut into faceted stones which are sold under the name of sunstones.[3] Colored stones are more valuable than clear stones, and faceting quality stones are more valuable than stones that cannot be cut. Seventy-five percent of the material recovered from Bytownite # 1 is colored stone while twenty-five percent is clear. The ALJ did not distinguish the geological composition of the six claims, but the overwhelming evidence indicated that they were composed of similar quality calcic labradorite.

The sunstones are recovered from the claims by picking the stones from the surface, by screening the basaltic rock with a quarter-inch screen and then handpicking the sunstones that remain on top of the screen, or by carefully prying the stones from the rock in small excavations. The stones are sold in their rough form to rockshops, collectors (rock hounds) and faceters. The evidence indicated that the faceted, colored stones are sold to jewelers and museums.

In 1968 and 1969, the first two years the Rodgers visited the Sunstone Area, they found red and green stones on the surface. Encouraged by the quality of the material they had found, the Rodgers returned in the spring of 1970 and began excavation.

The Rodgers have made substantial sales of the sunstones recovered from their claim.[4] From 1970 until June, 1975 the Rodgers grossed approximately $20,000 in sunstone sales. In the first six months of 1975 alone they had sales of $5,916.40.[5] In addition, the value of their inventory of faceting grade stones accumulated over the five-year period was estimated at $200,000, while their costs were less than $2,000 per year for the five months per year that they worked on the claim. There was undisputed expert testimony that an inventory of at least this size is needed to break into the existing foreign market.

At the contest hearing the witnesses disagreed on the value of the sunstones. Joseph Rudys, a BLM mining engineer, Chris Broili, a BLM geologist, and Del Davis, a rock shop proprietor testified for the government that the material discovered in the five disputed claims lacked value. Both Rudys and Broili, however, stated that they had no expertise regarding sunstones or gemstones or the market for those stones. The Rodgers presented their own testimony and testimony by Norman Peterson, a geol-

---

**3.** The government's witnesses refer to the material recovered from the disputed claims as feldspar material and refuse to label the stones gemstones. The claimants use the term sunstone to refer to all of the stones, clear or colored, recovered from their claims. The Bureau of Mines, in its 1965 edition of "Mineral Facts and Problems," defines gem material as "material that has three qualities—beauty, durability and rarity." It lists labradorite as a gem material. We adopt the government's definition, and will use the term "sunstone" to refer to all of the labradorite stones and "gemstone"

to refer to the colored sunstones of faceting quality.

**4.** Approximately one-third of the Rodgers' sales are made at rock shows to dealers, one-third at the claim, and one-third through mail orders received in response to their advertisement in the Lapidary Journal. Beginning in April, 1969 the ad generated a substantial number of orders from all over the world.

**5.** The 1975 sales included stones recovered in 1969 and 1970.

ogist for the State of Oregon, Howard Studdard, an amateur faceter and rock collector, and George Marshall, the locator of the Sun Queen # 1 and # 2 claims, indicating that the minerals discovered in the claims were valuable. In addition, James Miller, a mineral commodities marketing specialist, testified by deposition that the stones were valuable, and there was evidence from Dr. Frederick Pough, an eminent mineralogist, that the Rodgers' claim was valuable.

## I. The Prudent-Person and Marketability Test

■ To determine whether, prior to the withdrawal date, the deposits discovered were valuable mineral deposits under 30 U.S.C. § 22 (1976), the ALJ and IBLA must apply the "prudent-person test" (whether the deposits were of such a character as to justify a person of ordinary prudence in expending further labor and means with a reasonable prospect of success in developing a valuable mine) as complemented by the "marketability test" (whether the mineral can be extracted, transported and marketed at a profit). *United States v. Coleman,* 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968); *Melluzzo v. Morton,* 534 F.2d 860, 862 (9th Cir.1976). In *Barrows v. Hickel,* 447 F.2d 80, 83 (9th Cir.1971), this court stated:

> What is required is that there be, at the time of discovery, a market for the discovered material that is sufficiently profitable to attract the efforts of a person of ordinary prudence.

■ Although they referred to the test of marketability, the ALJ and IBLA failed to apply it properly. In holding the five disputed claims invalid, the ALJ based his conclusion on (1) the failure of the claimants to exploit their mines successfully, (2) the success of the Rodgers in developing the Bytownite claim and their resulting "cornering of the market," and (3) the sales of

the five disputed claims to the Rodgers. The ALJ's emphasis upon these facts demonstrates an erroneous application of the prudent-person/marketability test.

This court has made clear that although lack of actual marketing of the mineral by the claimant may be relevant to the question of marketability, it is not conclusive proof of invalidity of the claim. *Verrue v. United States,* 457 F.2d at 1203.

> [T]he claimant need not rely on his own successful marketing efforts to prove marketability of his material. If the successful marketing by others has sufficiently established that the claimant's comparable material is itself marketable, that can suffice.

*Melluzzo v. Morton,* 534 F.2d at 863 [footnote omitted].

The ALJ and IBLA pointed to the Rodgers' successful marketing as evidence that marketing of sunstones from the other claims would be unsuccessful. In effect, the ALJ and IBLA concluded that the Rodgers met the existing demand for sunstones. Invalidation of the claims on such grounds, however, gives insufficient weight to Rodgers' other evidence of marketability, and is inconsistent with this court's rulings that positive evidence of marketability overcomes a contention that other mines already produce an abundance of comparable material. *Charlestone Stone Products Co., Inc. v. Andrus,* 553 F.2d 1209, 1214 n. 6 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978); *Verrue v. United States,* 457 F.2d at 1204. Competition with existing sources may not be foreclosed because of their preemption of the market. In *Verrue,* this court expressly held that lack of sales of material from the disputed claims, together with evidence of an abundance of comparable material from other sources in the area, did not overcome the claimants' showing of marketability.[6] *Id.*

---

6. *United States v. Coleman,* 390 U.S. at 603–4, 88 S.Ct. at 1330–31 (1968), where the Supreme Court held that the immense quantities of identical stones found in the area was sufficient evidence for the conclusion that the claim lacked value, is distinguishable. The main issue in that case was whether the abundance of similar material indicated that the stone was a "common variety" and therefore excluded from the operation of the mining laws under the

The ALJ also relied upon the sales of the five claims to the Rodgers for relatively low sums to support his conclusion that the claims lacked value. But an equally plausible explanation of the sales is that the claimants could not afford to litigate the validity of the claims. The fact that two of the three claimants retained the right to twenty-five percent of the sales from the claims indicates their subjective view that the claims have value.

We conclude that the ALJ and IBLA improperly applied the marketability and prudent-person test. It is therefore necessary for us to examine the record to ascertain whether there was substantial evidence justifying a finding of invalidity under a proper application of the test.

II. Prima Facie Case

■ When the government contests a mining claim it bears the initial burden of presenting a prima facie case that the claim is invalid. The burden then shifts to the claimant to show by a preponderance of the evidence that a valuable mineral deposit has been discovered. *Humboldt Placer Mining Co. v. Secretary of Interior,* 549 F.2d 622, 624 (9th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 125, 54 L.Ed.2d 97 (1977).

The government, however, failed to present evidence sufficient to make out a prima facie case of invalidity. As discussed above, the key element of a prima facie case is that the market for the discovered material is not sufficiently profitable to attract the efforts of a person of ordinary prudence.

To demonstrate that the mineral on the five disputed claims lacked marketability the Bureau of Land Management offered testimony of two of its employees: Joseph Rudys, a mining engineer for BLM, and Chris Broili, a geologist with BLM. The IBLA has held that where a government mineral examiner testifies that he has examined a claim and found mineral values insufficient to support a finding of "discovery," a prima facie case of invalidity has been made. *United States v. Arcand,* 23

I.B.L.A. 226 (1976); *United States v. Heard,* 18 I.B.L.A. 43 (1974). Yet, this court has made clear that the testifying mineral examiner must be an expert as to the marketability or value of the *particular* mineral. *Charlestone Stone Products Co., Inc. v. Andrus,* 553 F.2d at 1213–14; *Verrue v. United States,* 457 F.2d at 1204. We are troubled by the lack of expertise of the government's witnesses regarding the marketability of sunstones and gemstones.

■ A trial court has broad discretion to admit or exclude expert testimony, and the court's decision must be sustained unless "manifestly erroneous." *Wood v. Stihl, Inc.,* 705 F.2d 1101, 1104 (9th Cir.1983); *United States v. An Article of Drug,* 661 F.2d 742, 745 (9th Cir.1981) (per curiam). Over the objection of Rodgers' attorney, the ALJ found the two witnesses qualified to testify as experts. He specifically limited the qualification, however, to testimony generally describing the make-up of the lava flow of labradorite in the Sunstone Area and the occurrence of the sunstones in the soil mantle there. We cannot say that decision was manifestly erroneous.

■ Notwithstanding the judge's articulation of the limited nature of the witnesses' expertise, and the witnesses' own admissions that they lacked qualifications to testify about the marketability of the sunstones, the ALJ permitted the witnesses to testify on the marketability of sunstones. Further, the ALJ relied upon that testimony in concluding that the claims were not valuable discoveries. Their testimony, however, establishes nothing as to the crucial issue of the stones' marketability. *See Verrue v. United States,* 457 F.2d at 1204.

Broili admitted that he had no expertise in marketing and had never before conducted a market survey. The survey he conducted here was no more than a few telephone calls to local rock shops. He did not show the rock proprietors samples of the stones from the disputed claims, nor did he discuss with them the difference between

specific language of 30 U.S.C. § 611. Moreover, the Court noted the suspect intentions of

the claimant to use the property as a residence. *Id.* at 603, 88 S.Ct. at 1330.

facet quality stones and tumbling material. The testimony of Rudys, the other government "expert", was similarly deficient. The only additional government testimony was by one rock store proprietor, who testified about his lack of sunstone sales. We can only conclude that the government presented no substantial evidence on which to base a prima facie case of non-marketability.

■ If a claimant submits evidence that supports the government's claim of invalidity, that evidence can be used to establish the government's prima facie case. Far from supporting invalidity, however, Rodgers' evidence establishes the validity of all six claims. Rodgers presented numerous witnesses, including a market expert and a renowned mineralogist, who testified directly about the marketability of the sunstones as gemstones. Rodgers' evidence indicated that, because seventy-five percent of the material he was recovering from the Bytownite claim was colored stone,[7] the market was not limited to local rock shops but included jewelery stores, museums, and a foreign market. He had made substantial sales within a short period of the withdrawal date. Rodgers and Marshall explained that their lack of further sales prior to the hearing was because they needed to accumulate an inventory before breaking into the foreign market. Even if we were to assume that the government established a prima facie case, the evidence clearly was sufficient to overcome it and establish the existence of a market for the stones.

## CONCLUSION

After fully considering the record as a whole, we hold that the ALJ and IBLA decisions were not supported by substantial evidence. The district court's summary judgment order in favor of the government is reversed.

REVERSED.

7. The government does not dispute that colored stones are more valuable than clear stones, nor does it dispute that the five contested claims

contain material comparable in quality to that found in the Bytownite claim.