733 F.2d 704
 The DREDGE CORPORATION, Plaintiff-Appellant,
v.
Kemp CONN, District Manager, Bureau of Land Management;
James Schalnus, Chief, Division of Operation, Bureau of Land
Management; William Malencik, Chief, Division of Technical
Services, Bureau of Land Management; Edward Spang, State
Director, Bureau of Land Management; Robert Burford,
Director, Bureau of Land Management; James Watt, Secretary
of the Interior, Department of the Interior, being agencies
of the United States Department of the Interior; United
States of America, Defendants-Appellees.
 No. 83-2362.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 14, 1984.
Decided May 22, 1984.
 
 John W. Bonner, Jones, Jones, Bell, Close & Brown, Las Vegas, Nev., for plaintiff-appellant.
 J. Carol Williams, Dept. of Justice, Donald T. Hornstein, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before TANG and PREGERSON, Circuit Judges, and CARROLL, District Judge.*
 PREGERSON, Circuit Judge:
 
 
 1
 The Dredge Corporation ("Dredge") appeals the decision of the Interior Board of Land Appeals ("Board") that Dredge did not have a valid placer mining claim[1] to Dredge No. 51, a 40-acre parcel of federally-owned land located five miles west of Las Vegas. The Board's decision was based on Dredge's failure to discover minerals of marketable value on Dredge No. 51 before the effective date of the Surface Resources Act, 30 U.S.C. Secs. 601-615. We affirm.
 
 I. Statutory Background
 
 2
 The acquisition of private mining rights in federally-owned land is governed by the Mineral Location Law of 1872. 30 U.S.C. Sec. 22. Under that law, an individual is entitled to enter, mine, and eventually obtain title to federally-owned land that is open to mineral entry.
 
 
 3
 To establish a valid mining claim a claimant must meet certain requirements. First, the claimant must "locate" the claim.[2] The procedures for locating a claim are prescribed by local custom or state law. See 30 U.S.C. Sec. 28. These procedures usually require the claimant to (1) post some form of notice on the land; (2) mark the boundaries of the claim; (3) conduct preliminary excavation or discovery work on the claim; and (4) record a certificate of location in the local mining district office. See 1 Rocky Mtn.Min.L.Inst.,American Law of Mining Sec. 5.49 (1981 ed.).
 
 
 4
 Second, the claimant must make a "discovery." This requires the discovery of a valuable mineral deposit on the claim. Whether a claim is sufficiently valuable is determined by the marketability test. Under that test, the claimant must show that the mineral on the claim can be "extracted, removed and marketed at a profit." United States v. Coleman, 390 U.S. 599, 600, 88 S.Ct. 1327, 1329, 20 L.Ed.2d 170 (1968); McCall v. Andrus, 628 F.2d 1185, 1188 (9th Cir.1980), cert. denied, 450 U.S. 996, 101 S.Ct. 1700, 68 L.Ed.2d 197 (1981).[3] A claimant who makes a valid discovery is entitled to apply for a patent which will convey title to the land in fee simple. 30 U.S.C. Sec. 29.
 
 
 5
 The Surface Resources Act, effective July 23, 1955, removed all common varieties of sand and gravel from future location under the general mining law.[4] In other words, after July 23, 1955, an individual could not enter federally-owned land for the purpose of mining sand and gravel. The Act contained a savings clause, however, that protected any valid mining claim located before the effective date of the Act. 30 U.S.C. Sec. 615. Under that clause, the claimant must show that he located and made a discovery on the claim before July 23, 1955. Dredge contends that its claim falls within this savings clause.
 
 II. Facts
 
 6
 Dredge No. 51 was located on July 21, 1952 for the purpose of mining sand and gravel. It lies on the edge of an alluvial fan composed of sand and gravel. Patented claims lie immediately to the south and southwest. One of these claims, called "Wells Cargo", contains an extensive sand and gravel operation that has operated continuously since 1952. Little or no work was done on Dredge No. 51, however, until 1962, except for a road built in 1954 connecting Dredge No. 51 and Wells Cargo.
 
 
 7
 The Bureau of Land Management ("BLM") has issued three contest complaints challenging the validity of the Dredge No. 51 claim. The first two were dismissed without prejudice. Then, in 1975, Dredge filed a patent application for Dredge No. 51. On October 6, 1977, the BLM responded by issuing a third contest complaint contending that: (1) the land within Dredge No. 51 was non-mineral in character; (2) no valid discovery of valuable minerals had been made; and (3) the mineral material on Dredge No. 51 could not have been marketed at a profit before July 23, 1955.
 
 
 8
 After a hearing, an Administrative Law Judge ("ALJ") held that Dredge had established that the mineral deposit on Dredge No. 51 was marketable. The ALJ based his decision on Dredge No. 51's substantial similarity and proximity to other claims that were being mined at a profit and on the additional fact that between 1962 and 1966 Dredge had removed and sold 70,000 cubic yards of material from Dredge No. 51. On appeal, the Interior Board of Land Appeals reversed the ALJ's decision and denied Dredge's patent application. The Board specifically rejected the ALJ's reliance on the "substantial similarity" between Dredge No. 51 and neighboring claims. Dredge then filed a complaint in district court seeking review of the Board's decision. The district court entered summary judgment for the BLM.
 
 III. Analysis
 
 9
 Our review of a Board decision is limited. We are required to uphold the decision unless it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law." Melluzzo v. Watt, 674 F.2d 819, 820 (9th Cir.1982); 5 U.S.C. Sec. 706(2)(A). The principal issue here is whether Dredge discovered a valuable mineral deposit on the Dredge No. 51 claim before the critical date of July 23, 1955.
 
 
 10
 The Board's determination that the mineral deposit on Dredge's claim was not marketable in 1955 is supported by substantial evidence. Under the marketability test, the claimant must show that the claim can be "extracted, removed and marketed at a profit." Coleman, 390 U.S. at 600, 88 S.Ct. at 1329 (1968); McCall, 628 F.2d at 1188; Rawls v. United States, 566 F.2d 1373, 1376 (9th Cir.1978). The claimant need not show that he actually sold minerals at a profit before 1955, although the absence of sales is a relevant factor in determining marketability. Rawls, 566 F.2d at 1376. However, "when there is little or no evidence of pre-1955 sales, a court should consider costs of extraction, preparation, and transport as well as then-existent market demand." Id. In this case, the government showed that in 1955 the supply of sand and gravel in the Las Vegas area far exceeded local demand. Only 150 out of 40,000 acres of potential sand and gravel sites were being mined before 1955. Further, the demand for sand and gravel began to decline in 1955 after a boom in local construction from 1952 to 1954. This decline continued until the early 1960's. Although the record is conflicting, the government offered evidence that little or no mining activity occurred on Dredge No. 51 before 1955, with the exception of the construction of a road. This lack of mining activity lends support to the government's contention that the local market was weak in 1955.
 
 
 11
 In addition, the government's expert, Shinzi Kuniyoshi, testified that he had examined the claim in 1977 and found that the mineral deposit on Dredge No. 51 was of poorer quality than other deposits in the area. He also testified that it would have been more costly to extract sand and gravel from Dredge No. 51 than from neighboring claims because Dredge No. 51 contained a greater quantity of caliche.[5] He thus concluded that Dredge No. 51 could not have been mined and marketed at a profit in 1955.[6]
 
 
 12
 Dredge offered no contrary evidence regarding market supply and demand in the Las Vegas area in 1955. Indeed, Dredge concedes that a prudent person would not have mined Dredge No. 51 in 1955, but would have waited until 1960 when the local demand increased. The Board thus reasonably concluded that Dredge could not have profitably mined and marketed the deposit on Dredge No. 51 in 1955. Moreover, Dredge would have had difficulty competing in the weak local market because of the deposit's poor quality and high extraction costs.
 
 
 13
 Dredge contends, however, that the deposit on Dredge No. 51 should have been deemed marketable merely because of its proximity and similarity to existing patented claims. We disagree. First of all, the government demonstrated important differences between Dredge No. 51 and nearby claims. Dredge No. 51 had less loose material and had a thick layer of caliche.
 
 
 14
 Moreover, Dredge's argument is inconsistent with the approach we set forth in Melluzzo v. Morton, 534 F.2d 860 (9th Cir.1976) for determining the marketability of a mineral deposit. In Melluzzo, we stated that the existence of a local market for sand and gravel alone is not sufficient to establish marketability. Id. at 863. In other words, the claimant cannot rely solely on the fact that comparable material is being marketed. Rather, "[t]he claimant must establish that his material was of a quality that would have met the existing demand and that it was marketable at a profit." Id. (emphasis added). The profitability of a particular deposit is determined not only by its cost of extraction, preparation for market, and transportation to market, but also by the overall market demand and supply. Id. at 864. Proof that neighboring claims are being marketed is relevant to determining a claim's marketability, but such proof alone does not overcome evidence that the market was already well-supplied. The claimant must also show that given existing market conditions his particular claim could have returned a profit.
 
 
 15
 Dredge's argument is also problematic because it rests on the erroneous assumption that a discovery of valuable minerals on one claim automatically inures to the benefit of neighboring claims. In Melluzzo, we noted that the supply conditions in the industry, particularly the number of potentially competitive sources of supply, have a direct bearing on whether new material will be marketable. "If supply ... so overwhelms the existing demand as to reduce the value or profit increment to a level below that which would prove attractive to a prudent man, the material cannot be said to be marketable at a profit." Id. at 864. Thus, even though comparable claims are being mined, a new claim may be deemed unprofitable because the market has reached such a point of saturation that a new entrant can not make a profit. The focus therefore is on the profit margin for the new entrant and not on the profit margin for existing suppliers.
 
 
 16
 The Board carefully considered the appropriate supply and demand factors in reaching its conclusions. In light of our limited scope of review, we will not second-guess the Board's determination that the market conditions would not have permitted Dredge to have mined Dredge No. 51 at a profit in 1955.[7]
 
 
 17
 AFFIRMED.
 
 
 
 *
 Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Under general mining law there are two categories of mineral claims. A "lode" claim involves "veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits ...." 30 U.S.C. Sec. 23. A "placer" claim involves all other forms of mineral deposits, including sand and gravel. 30 U.S.C. Sec. 35
 
 
 [2]
 Some authorities use the term "location" to describe the overall process of obtaining a valid claim. See 1 Rocky Mtn.Min.L.Inst., American Law of Mining, Sec. 4.13 (1981 ed.). Here, we use location to describe the process of staking a mining claim as distinguished from the process of "discovering" a valuable deposit
 
 
 [3]
 The marketability test is a refinement of the "prudent-man" test that was used before Coleman to determine whether claims contained valuable mineral deposits. Id. 390 U.S. at 602, 88 S.Ct. at 1330. Under the prudent-man test, a claim was held to contain a valuable deposit if a "person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine [on the claim] ...." Id. (quoting Castle v. Womble, 19 L.D. 455, 457 (1894)). Since the Coleman decision, this court has primarily used the marketability test. See, e.g., McCall, 628 F.2d at 1188; Rawls v. United States, 566 F.2d 1373, 1375-76 (9th Cir.1978)
 
 
 [4]
 The Surface Resources Act provides in pertinent part:
 No deposit of common varieties of sand, stone, gravel ... shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mineral claim hereafter located under such mining laws ....
 30 U.S.C. Sec. 611 (emphasis added).
 
 
 [5]
 Caliche is a hard soil layer cemented by calcium carbonate
 
 
 [6]
 The testimony of an expert that the claim could not have been marketed at a profit establishes a prima facie case of nonmarketability. See McCall, 628 F.2d at 1189
 
 
 [7]
 Our recent decision in Rodgers v. Watt, 726 F.2d 1376 (9th Cir.1984), does not conflict with the conclusion we reach today. In Rodgers, the BLM challenged the validity of six claims that different individuals had located in Lake County, Oregon, for the purpose of mining sunstones. All the claims were located before the land was withdrawn from operation of the mining laws, but only the Rodgers worked their claim. In holding the five unworked claims invalid, the ALJ based his conclusion on (1) the failure of the other claimants to exploit their mines successfully, (2) the success of the Rodgers in developing their own claim and their "cornering of the market," and (3) the sale of the five claims to the Rodgers. We reversed, holding that the ALJ had erroneously applied the prudent-person/marketability test that the government had failed to make out a prima facie case of nonmarketability
 The case at hand is distinguishable from Rodgers. First of all, here, the IBLA carefully avoided relying on the lack of sales as evidence of nonmarketability. Second, the government's expert witness Kuniyoshi was far more qualified than the experts who testified in Rodgers, and Kuniyoshi's testimony was sufficient by itself to make out a prima facie case of nonmarketability. Third, the disputed claims in Rodgers were essentially identical to an undisputed claim owned and profitably marketed by Rodgers for several years. In this case, Dredge failed to prove that Dredge No. 51 was sufficiently similar to Dredge No. 60 to be equally deemed marketable.
 Finally, Rodgers demonstrated that he had sold sunstones on the local market for a number of years and that such stones could be marketed internationally. Indeed, Rodgers offered evidence that he was then preparing to enter foreign markets. Such evidence of marketability was sufficient to overcome the government's contention that the market for sunstones was already well supplied. Here, however, Dredge offered little evidence to support the marketability of Dredge No. 51 in 1955. Thus, Dredge was unable to overcome the government's contention that the supply of sand and gravel in 1955 so exceeded demand as to prevent a prudent person from mining Dredge No. 51 at that time.