**ALASKA LIMESTONE CORPORATION, Plaintiff,**

v.

**Donald HODEL, Secretary, United States Department of the Interior, William J. Whalen, Director, National Park Service, and the United States of America, Defendants.**

**No. A 82–392 Civil.**

United States District Court, D. Alaska.

April 12, 1985.

Edgar P. Boyko and Charles E. Tulin, Boyko, Davis & Dennis, Anchorage, Alaska, for plaintiff.

Michael R. Spaan, U.S. Atty., Anchorage, Alaska, for defendants.

## OPINION

FITZGERALD, Chief Judge.

This cause comes before the court on cross-motions for summary judgment. The litigation raises important issues of statutory construction, administrative procedure and judicial review surrounding the government's implementation of federal mining laws in the national parks. For the reasons set forth below, plaintiff's (Alaska Limestone's) summary judgment motion is now denied and defendants' (the government's) motion for summary judgment will be granted.

FACTS

On November 25, 1958, Alaska Limestone properly recorded a number of unpatented limestone mining claims within the Foggy Pass area of Mt. McKinley National Park.[1] Congress permitted mining activity within McKinley during this period.

It is undisputed that Alaska Limestone's claims contained large deposits of high quality limestone, a primary ingredient for cement production. Studies by the University of Alaska and the United States Geological Survey have well established the importance of the location. On August 16, 1960, Alaska Portland Cement Corporation obtained for $8,500 a five-year option from Alaska Limestone to buy Alaska Limestone's McKinley claims. The price, if the

---

1. The park's name was changed to Denali National Park & Preserve with the passage of the Alaska National Interest Lands Conservation Act (ANILCA) in 1980. *See* 16 U.S.C. § 410(hh)(1) (1980).

option were to be exercised, amounted to 15 million dollars.

During the next two decades, Alaska Limestone did not develop its unpatented claims in the park. The company seems to have attempted to build an access road to its claims in McKinley Park, but was blocked from doing so by the National Park Service because of failure on the part of the company to obtain the requisite permits. Additionally, Alaska Portland Cement chose not to exercise its option to purchase Alaska Limestone's claims. According to Alaska Limestone, this decision did not reflect any belief by the cement company that Alaska Limestone's claims did not contain rich quantities of limestone. Rather the cement company's decision reflected uncertainty over whether the government would ever permit the construction of an access road to the claims.[2]

On September 28, 1976, an Act of Congress further diminished the chances that Alaska Limestone's unpatented claims would ever be developed. On that date, Congress formally withdrew lands in McKinley from mineral entry. Pub.L. 94–429, 16 U.S.C. §§ 1901–1912 (1982). In passing the so-called "Mining in the Parks Act," Congress noted that mining activities were threatening important environmental values within the National Park System. Congress declared that:

> all mining operations in areas of the National Park System should be conducted so as to prevent or minimize damage to the environment and other resource values, and, *in certain areas of the National Park System, surface disturbance from mineral development should be temporarily halted while Congress determines whether or not to acquire any valid mineral rights which may exist in such areas.*

16 U.S.C. § 1901(b) (1982) (emphasis added).

Most importantly for Alaska Limestone's purposes, Congress provided in § 1905 of the Act that:

> within two years after September 28, 1976, the Secretary of the Interior shall determine the validity of any unpatented mining claims within ... Mount McKinley National Park and submit to the Congress recommendations as to whether *any valid or patented* claims should be acquired by the United States, including the estimated acquisition costs of such claims, and a discussion of the environmental consequences of the extraction of minerals from these lands.

16 U.S.C. § 1905 (1982) (emphasis added).

The Secretary of Interior (the Secretary) failed to comply with § 1905's two-year deadline to inventory the validity of the unpatented mining claims and to report his findings to Congress. Nevertheless, under his direction the Bureau of Land Management (BLM) initiated a contest challenging the validity of Alaska Limestone's McKinley mining claims on March 21, 1979.[3] Within a week, Alaska Limestone filed a complaint in this court. It sought, among other things, a declaration that the enactment of the Mining in the Parks Act, and the Secretary's subsequent failure to determine the validity of its McKinley claims within § 1905's statutory deadline, constituted a taking of its property without due process of law. This action was dismissed as premature.

In the BLM contest, a hearing was held by an Administrative Law Judge of the Office of Hearings and Appeals, Department of the Interior, May 6 to May 10, 1980, in Anchorage, Alaska. At the outset

---

**2.** Alaska Limestone apparently did not formally apply for the requisite road construction permits until March 10, 1978, long after the cement company allowed its option to buy Alaska Limestone's claims to lapse. According to Alaska Limestone's papers, on May 11, 1978, an official of the National Park Service informed Alaska Limestone that its request for a road construction permit would not be considered until after

the agency determined the validity of the unpatented claims. Such a determination was required by Public Law 94–429 discussed *infra.*

**3.** *See* 43 C.F.R. §§ 4.451 to 4.452–9 (1984) for the pertinent federal regulations authorizing and regulating government contests of unpatented mining claims.

of the hearing, Alaska Limestone moved to dismiss the government's contest on jurisdictional grounds. Specifically, Alaska Limestone argued to the Administrative Law Judge, as it has done here, that the Secretary lost his long-established authority to pass on the validity of Alaska Limestone's claims when he failed to comply with § 1905's two-year deadline. The Administrative Law Judge held that the Secretary's authority to contest such unpatented claims remained intact, and denied Alaska Limestone's motion to dismiss.

During the subsequent five day hearing, the government and Alaska Limestone presented extensive oral and documentary evidence to the Administrative Law Judge. At issue was the marketability of the contested claims. Although the government conceded that Alaska Limestone's claims contained large deposits of high-quality limestone, it argued that the claims were nonetheless without validity due to lack of a reasonable market for the limestone. Alaska Limestone presented substantial evidence which, if asserted, demonstrated that absent government interference, its claims were highly marketable.

On July 15, 1981, the Administrative Law Judge issued a decision concluding Alaska Limestone's unpatented McKinley mining claims were invalid due to their lack of marketability. Alaska Limestone appealed the Administrative Law Judge's decision to the Interior Board of Land Appeals (IBLA) of the Department of the Interior. In its opinion of August 25, 1982, the IBLA affirmed the ALJ's decision. *United States v. Alaska Limestone Corp.*, 66 IBLA 316 (1982). Shortly thereafter Alaska Limestone brought the present litigation in this court.

In its complaint, Alaska Limestone has alleged three causes of action. First, it reasserts the argument made before the ALJ that the Department of Interior lacked jurisdiction to contest the validity of Alaska Limestone's mining claims. Second, because the Department of Interior improperly exercised jurisdiction, it is argued, the government took a valuable property right from Alaska Limestone without due process. Third, Alaska Limestone asserts that the decision of the ALJ was erroneous because, among other things, the evidence presented at the administrative hearing supported a finding that there was a market for the limestone from Alaska Limestone's McKinley claims.

I now conclude that the judgment of the administrative bodies below must be upheld.

## DISCUSSION

### *Jurisdictional Challenge*

The first issue to be resolved is Alaska Limestone's contention that the Secretary of Interior lost his long-established authority to contest unpatented mining claims within McKinley and other parts of the National Park System. Specifically, Alaska Limestone avers that because the Secretary failed to meet the Mining in the Parks Act's two-year deadline to report to Congress, he was automatically divested of jurisdiction to contest Alaska Limestone's claims. Such jurisdiction, plaintiff argues, vested in this court under § 1910 of the Mining in the Parks Act.[4]

Alaska Limestone's jurisdictional argument is essentially rooted in two legal doctrines. These are the doctrines of implied

---

**4.** This provision of the Act vests jurisdiction in the federal court to hear taking claims brought by possessors of both patented and unpatented mining claims who allege their property rights have been injured by operation of the statute. It provides as follows:

§ 1910. Civil actions for just compensation by mining claim holders

The holder of any patented or unpatented mining claim subject to this chapter who believes he has suffered a loss by operation of this chapter, or by orders or regulations issued pursuant thereto, may bring an action in a United States district court to recover just compensation, which shall be awarded if the court finds that such loss constitutes a taking of property compensable under the Constitution. The court shall expedite its consideration of any claim brought pursuant to this section.
(Pub.L. 94–429, § 11, Sept. 28, 1976, 90 Stat. 1344.)

repeal[5] and administrative estoppel. Under the doctrine of implied repeal, courts have historically found an implied congressional intent that the provisions of the earlier of two statutes covering a similar subject (e.g. mining law) be ignored by the courts in two specific instances. First, where provisions in the two acts are in "irreconcilable conflict," the later act to the extent of the conflict constitutes an implied repeal of the earlier one. *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). Additionally, if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. *Id.*

In challenging the Secretary's exercise of jurisdiction in this case, Alaska Limestone has asserted that Congress impliedly intended § 1905 of the Mining in the Parks Act to circumscribe the Secretary's traditional contest powers. A review of the pertinent sections of this Act, however, does not reveal the existence of any "irreconcilable conflict" between the provisions of this statute and earlier powers to initiate contests of mining claims granted the Secretary.[6] Indeed, the tasks Congress placed on the Secretary in the Act, those of determining the validity of unpatented mining claims within several of the national parks and making recommendations to Congress about acquisition of valid claims within them, clearly complemented rather than conflicted with the Secretary's traditional management responsibilities. Prior to the enactment of the Mining in the Parks Act, the Secretary had discretion to determine the validity of unpatented mining claims within these parks, but under the Act, he was under a congressional mandate to do so.

Nor does the Act's legislative history demonstrate that Congress intended the provisions of the Mining in the Parks Act to impliedly repeal the Secretary's authority. In this instance, to the contrary, Congress' intention that the Secretary's historic regulatory power to contest such mining claims remain intact is repeatedly noted.[7] The only statements made on the issue of repeal pertain to Congress' intent *expressly* to repeal those provisions of the mining laws which had authorized mineral exploration and development in National Park System units like McKinley in the first place.[8]

Finally, in dismissing any notions that Congress sought to impliedly repeal the Secretary's traditional contest powers through passage of this legislation, recent decisions of the United States Supreme Court relating to the doctrine of implied repeal are instructive. In *American Bank & Trust Co. v. Dallas County,* the Court strongly reiterated that "repeals by implication are not favored." 463 U.S. 855, 860, 103 S.Ct. 3369, 3373, 77 L.Ed.2d 1072 (1983) (citing *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936) ); *see also Tennessee Val-*

---

**5.** Alaska Limestone has not argued that the Mining in the Parks Act contains language expressly restricting the Secretary's authority to contest mining claims. A review of the statute reveals no such express repeal.

**6.** Although federal mining laws have never explicitly conferred such authority upon the Secretary, the courts have long held that the Secretary's plenary authority over the public lands impliedly vests him with this contest power. *See, e.g., Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cameron v. United States,* 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920); *Davis v. Nelson,* 329 F.2d 840, 846 (9th Cir.1964). The Secretary's authority to initiate contests, and the procedures he must follow, are codified at 43 C.F.R. § 4.451 to 4.452–9 (1984).

**7.** For example, in favorably reporting the legislation to the House of Representatives, the House Committee on Interior and Insular Affairs explicitly noted that mining claimants within the National Park System remain "subject to such regulations as the Secretary may prescribe." It was further stated that the Secretary's general "management control" over mineral activities within the National Park System, based on his "responsibility to preserve the natural values of these areas," would remain intact. *See* H.Rep. No. 94–1428, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 2487–92.

**8.** *Id.*

*ley Authority v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978); *Runyon v. McCrary,* 427 U.S. 160, 172 n. 10, 96 S.Ct. 2586, 2595 n. 10, 49 L.Ed.2d 415 (1976).[9]

The other facet of Alaska Limestone's jurisdictional challenge over the Secretary's authority to contest its McKinley mining claims seems to rest on principles of administrative estoppel. Alaska Limestone argues that because the Secretary "did not act timely in submitting estimated acquisition costs of the mining claims in Mt. McKinley," the government was "estopped" from exercising jurisdiction to contest the validity of Alaska Limestone's claims.

■ The principle of administrative estoppel derives from the long-standing doctrine of equitable estoppel. When applied to individual litigants, this doctrine basically holds that where the party complaining himself has "unclean hands," basic fairness demands that he be estopped from seeking redress from the very condition his conduct reasonably induced. *See, e.g., Bankers Trust Co. v. Pacific Employers Insurance Co.,* 282 F.2d 106, 112 (9th Cir.1960); *see also* Bigelow, Law of Estoppel 603 (6th ed. Carter 1913) ("He who keeps silent when duty commands him to speak shall not speak when duty commands him to keep silent.").

Although the doctrine of equitable estoppel has been frequently relied upon by the courts in resolving disputes between private litigants, its propriety as a shield against suits brought by the government has been uncertain.[10] The Fifth Circuit, for example, has suggested that the government is subject to estoppel when it acts in a proprietary manner, but not when it exercises its sovereign powers for the benefit of the public. *See, e.g., United States v. Florida,* 482 F.2d 205, 209 (5th Cir.1973).

■ The Ninth Circuit has permitted use of the doctrine against the government, but only in very limited circumstances. In addition to demonstrating that the traditional elements of equitable estoppel are present, the party claiming estoppel against the government must also show "affirmative misconduct" as opposed to "mere failure to inform or assist." *Lavin v. Marsh,* 644 F.2d 1378, 1382 (9th Cir. 1981). There is no "all-purpose test" to detect the presence of affirmative misconduct. The court must analyze all of the circumstances of alleged misconduct and determine on a case-by-case basis whether sufficient affirmative government misconduct has occurred to invoke the estoppel doctrine against the government. *Id.* at 1382 n. 6.

■ Here the gist of the government's alleged affirmative misconduct is that the Secretary failed to comply with certain inventory and reporting deadlines set by Congress.[11] Certainly the Secretary's failure

**9.** As noted earlier, the Secretary's authority to initiate contests over the validity of unpatented mining claims has not been expressly granted in the federal mining statutes. Rather this power has been construed as an inherent subset of the Secretary's statutorily-based plenary authority over management of the public lands. Thus Alaska Limestone's claim that Congress intended to repeal by implication the Secretary's contest powers if he failed to comply with the time lines set out in the Mining in the Parks Act is a hybrid use of the implied repeal doctrine. For here the doctrine is being used to support the argument of congressional repeal of administrative regulations rather than of statutory provisions. To this extent reliance on the doctrine appears even less apposite.

**10.** In *Federal Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Supreme Court held that the United States government could not be equitably estopped by the conduct of its agents. Although never overruled, the *Merrill* bar against use of the doctrine against the federal government has eroded in the fact of later Supreme Court precedents which state that an open issue exists whether estoppel lies against the government if a party proves "affirmative misconduct" on the part of a government agent. *See Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *United States Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973).

**11.** In its papers, Alaska Limestone suggested that the government acted in "bad faith" during the hearings before the ALJ, engaging in "unethical machinations" and "procedural charades."

to carry out the command of Congress merits no applause. Alaska Limestone has offered nothing to demonstrate that the Secretary intentionally ignored his responsibilities or affirmatively sought to deceive or mislead Alaska Limestone concerning his intentions to contest the corporation's McKinley mining claims. In short, I conclude the inaction of the Secretary in this instance does not justify the imposition of the doctrine of equitable estoppel against the government.[12]

■ I conclude Alaska Limestone has failed to demonstrate either an express or implied intention by Congress to restrict the Secretary's long-established authority to contest the validity of mining claims by enactment of the Mining in the Parks Act. Nor has Alaska Limestone established a sufficient factual basis to equitably estop the Secretary from exercising his authority to initiate a contest of Alaska Limestone's unpatented claims. I conclude that the Secretary properly exercised jurisdiction to challenge Alaska Limestone's McKinley mining claims.

## DUE PROCESS CHALLENGE

Alaska Limestone's second cause of action is inextricably intertwined with Alaska Limestone's jurisdictional argument. The corporation avers that because the Secretary improperly exercised jurisdiction in this case, his ultimate determination that Alaska Limestone's McKinley mining claims were invalid constituted a governmental taking of property without due process of law. The sole forum for the government to contest the validity of Alaska Limestone's claims, it is argued, became the district court once the Secretary failed to comply with the Mining in the Parks Act's strict timeliness.

Regarding the first prong of this argument, that the Secretary's determination of invalidity constituted a taking of Alaska Limestone's property without due process because of lack of jurisdiction, I have concluded otherwise. The second prong, that the district court was the only forum available to the Secretary to contest Alaska Limestone's claims, must also be rejected.

■ It is true that the Mining in the Parks Act makes a specific grant of jurisdiction to the district court. Such jurisdiction, however, is not exclusive of the Secretary's administrative jurisdiction to determine the validity of mining claims on public lands. Section 1910 of the Act, entitled "Civil Actions for Just Compensation by Mining Claim Holders," merely expressly condifies a mining claimant's traditional right to appeal as adverse administrative determination to federal court.[13] The provision thus statutorily emphasizes Congress' intention that valid mining claimants be properly compensated for any property taken by the government "by operation of this chapter, or by orders or regulations issued pursuant thereto."[14]

In addition to finding that the Secretary properly exercised jurisdiction in this case,

---

Plaintiff's Motion for Summary Judgment at 28 n. 1 (filed Aug. 15, 1983). My extensive review of the administrative record, however, has revealed no such evidence of procedural impropriety.

12. *See, e.g., Lavin v. Marsh,* 644 F.2d 1378, 1383 (9th Cir.1981) (finding "the facts in this case [pertaining to the Secretary of the Army's use of his authority to remove a lieutenant colonel from active service in the Army Reserve] do not justify such an extraordinary exercise of judicial power"); *California Pacific Bank v. Small Business Administration,* 557 F.2d 218, 225 (9th Cir. 1977) (finding "under these circumstances that the SBA did not engage in ... 'affirmative misconduct' "); *Santiago v. Immigration and Naturalization Service,* 526 F.2d 488, 493 (9th Cir.

1975), *cert. denied,* (en banc immigration decision finding no estoppel) 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The court notes that although it has found that the doctrine of administrative estoppel is unavailable in this case, it may well have concluded an earlier action for administrative *mandamus* to require the Secretary to comply with the Mining in the Parks Act's deadlines was appropriate. *See, e.g., Work v. United States ex rel. Rives,* 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561 (1925); *Pattillo v. Schlesinger,* 625 F.2d 262 (9th Cir.1980).

13. For the express language of § 1910, *see supra* note 4.

14. 16 U.S.C. § 1910 (1982).

I conclude that the government complied with the administrative procedures required under 43 C.F.R. § 4.451–1 to 4.452.-9.[15] As such, Alaska Limestone's claim that its due process rights were *per se* violated by the Secretary's mere assertion of jurisdiction in this case lacks merit. Whether the company's property was taken by the government without just compensation requires review of the administrative determination invalidating Alaska Limestone's McKinley mining claims.

## CHALLENGE TO ADMINISTRATIVE DECISION

In addition to challenging the procedures followed by the government in this case, Alaska Limestone has attacked the substantive merits of the administrative determination of invalidity reached below. In reviewing this administrative decision, jurisdiction may be conferred under § 1910 of the Mining in the Parks Act[16] as well as under the Administrative Procedure Act[17] and 28 U.S.C. § 1331(a).[18]

Alaska Limestone demands reversal of *United States v. Alaska Limestone Corp.,* 66 IBLA 316 (1982). This decision affirmed the ALJ's holding that Alaska Limestone's McKinley claims were invalid. The appropriate standard of review permits reversal of the IBLA decision only if, upon review of the entire administrative record, I conclude the decision is not supported by substantial evidence. 5 U.S.C. § 706(2)(E); *Rodgers v. Watt,* 726 F.2d 1376, 1377 (9th Cir.1984); *Doria Mining & Engineering Corp. v. Morton,* 608 F.2d 1255, 1257–58 (9th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 237 (1980); *Laden v. Andrus,* 595 F.2d 482 (9th Cir.1979);

*Verrue v. United States,* 457 F.2d 1202, 1204 (9th Cir.1972).

The facts in this case are not subject to a trial *de novo* and I may not substitute my judgment for that of the administrative agency. *Multiple Use, Inc. v. Morton,* 504 F.2d 448, 452 (9th Cir.1974). "The expertise of the Department of Interior must be looked upon with respect and considered with care." *Id.*

██ My review of the evidence and the relevant authorities leads me to conclude that the findings and conclusions of the administrative bodies below are correct; they rest upon proper understanding of the law and are supported by substantial evidence.

To determine whether, prior to the withdrawal date of McKinley lands from mineral entry, Alaska Limestone's claims were valuable mineral deposits under 30 U.S.C. § 22 (1982), the ALJ and IBLA were required to apply the so-called "prudent person test" (whether the deposits were of such a character as to justify a person of ordinary prudence in expending further labor and means with a reasonable prospect of success in developing a valuable mine) as complemented by the so-called "marketability test" (whether the mineral can be extracted, transported and marketed at a profit). *United States v. Coleman,* 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968); *Rodgers v. Watt,* 726 F.2d 1376, 1379 (9th Cir.1984); *Melluzzo v. Morton,* 534 F.2d 860, 862 (9th Cir.1976); *Barrows v. Hickel,* 447 F.2d 80, 83 (9th Cir.1971).

The decisions of the ALJ and IBLA in this case reveal that these administrative

---

**15.** Although the Secretary could properly make his validity determination in accordance with these established administrative procedures, as he chose to do in this case, *see Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Davis v. Nelson,* 329 F.2d 840 (9th Cir.1964), he could also, at his election, have initiated contest proceedings directly in the district court. *See United States v. Zweifel,* 508 F.2d 1150 (10th Cir.) *cert. denied,* 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975); *see also Hallenbeck v. Kleppe,* 590 F.2d 852 (10th Cir. 1979).

**16.** *See* note 4 for the text of § 1910.

**17.** *See* 5 U.S.C. § 702 (1982), which provides in pertinent part that "[a] person suffering legal wrong because of an agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

**18.** This is the statute granting the federal courts "federal question" jurisdiction.

tribunals properly used and applied these legal standards to Alaska Limestone's claims. Although the government stipulated with Alaska Limestone at the hearing before the ALJ that each of the McKinley claims contained a substantial quantity of high grade limestone suitable for use in agriculture and in cement production, the presence of large quantities of an extractable mineral is not in itself sufficient to make an unpatented mining claim valid. Applying the above noted standards, both the ALJ and the IBLA concluded that Alaska Limestone's claims were invalid because there was simply no viable market for the limestone on those claims at the relevant times.

The IBLA and ALJ specifically rejected Alaska Limestone's argument that the corporation could have created its own market for the limestone by constructing a profitable Portland cement facility in the vicinity of its McKinley claims. The IBLA noted that the presumption of unmarketability due to extended lack of mineral production was rebuttable. *United States v. Alaska Limestone Corp.*, 66 IBLA at 320. It found, however, that Alaska Limestone had failed to present sufficient factual evidence to overcome this presumption. *Id.* The Board concluded that:

> Where a claimant actually could have sold minerals on the cutoff date in an ongoing market, it is possible to demonstrate convincingly that the mineral was marketable at a profit on that date, by showing pertinent facts about the condition of the market, such as the prevailing sales price, market demand, and costs of production.... In contrast, where, as here, there was *no* market on the cutoff date in which the material could have been directly sold at a profit, and the claimant hypothesizes that it could have profitably established its own market for direct sales of the material, the difficulty of proving the hypothesis with convincing factual evidence is compounded. By presuming the existence of its own ce-

ment processing plant, appellant places us in a strictly theoretical arena, where estimates and conjecture replace evidence of the circumstances that actually prevailed. *The conclusions from this exercise are too uncertain and conjectural to overcome the plain implications of appellant's failure over 18 years to actually accomplish the profitable development of these claims.*

*Id.* at 321 (emphasis added).

The Board also held that Alaska Limestone had failed to prove its claim that the Department of Interior had illegally prevented the corporation from developing its McKinley claims:

> [Alaska Limestone] suggests that the Department is to blame for its failure to develop these claims. It refers to incidents in 1960 and 1969 where National Park Service (NPS) personnel cited appellant's representative for driving a Caterpillar tractor on a "cat trail" that appellant had constructed near the claims, and alleges that NPS failed to approve its access to them in 1960. However, appellant does not deny that it has never had a permit from NPS to construct a road across the park land surrounding its claims. In any event, it apparently never appealed any local NPS action that allegedly illegally inhibited its access to these claims. In the absence of any effort by appellant either to seek prior formal approval to drive vehicles across park lands into the claims, or to seek subsequent redress from NPS' alleged prohibition of access to them, we do not recognize any basis for concluding that NPS improperly prevented appellant from developing its claims.

*Id.* at 326 (citations omitted).

Further review of the administrative record in this case reveals that the administrative determination that Alaska Limestone's McKinley claims were invalid was supported by substantial evidence.[19] I con-

---

**19.** As noted in its recent filing of excerpts from the administrative record, the government presented ample testimony at the hearing before Administrative Law Judge E. Kendall Clarke demonstrating that, contrary to Alaska Limestone's arguments, there was little likelihood

clude that Alaska Limestone's McKinley mining claims were properly found to be invalid. An award of compensation under § 1910 of the Mining in the Parks Act is therefore inappropriate.[20] Summary judgment will be granted for the government on this issue.

IT IS NOW ORDERED:

1) That the government's motion for summary judgment on the issue of its jurisdiction to invalidate Alaska Limestone's McKinley mining claims is GRANTED;

2) That the government's motion for summary judgment on the issue of alleged violations of Alaska Limestone's due process rights is GRANTED; and

3) That the government's motion for summary judgment on Alaska Limestone's challenge of the administrative determination that Alaska Limestone's mining claims were invalid is GRANTED.

that the construction of a Portland cement facility would be financially viable in Alaska throughout the pertinent time periods. The testimony of government witness Edward Bracken of the Division of Economic Enterprise for the State of Alaska, for example, demonstrated that Kaiser Permanente Corporation chose not to build a cement processing facility in Alaska to develop limestone claims such as those staked by Alaska Limestone because the company concluded such a plant would not be economically attractive. The testimony of Charles J. Weiler, Supervisory Mining Engineer for the National Park Service, also presented substantial evidence on the issue of the marketability of Alaska Limestone's claims. As highlighted by the government, the following testimony given by expert Weiler before Judge Clarke was especially pertinent:

Q. And did you go to those claims?
A. Yes, I did.
Q. And when was that?
A. First day on the claims was July the 20th, 1978.
(TR. 37)
Q. ... this isn't the first time, I take it, that you have examined any mining claims for the purpose of validity, is it?
A. It is not the first time, no.
Q. Approximately how many mining claims have you examined for that purpose in the past?
A. Since 1972 I've examined between five and six hundred claims.
(TR. 52)

Q. What is your opinion as to whether a reasonable man would have been justified, in 1976, in developing these particular claims with a reasonable prospect of being able to sell the (limestone) deposits from those claims at a profit?
A. My opinion is that he could not.

. . . . .

Q. ... could those limestone deposits have been marketed for agricultural uses?
A. No, certainly not.
Q. Could (those limestone) deposits have been marketed for aggregate in '76?
A. No.

. . . . .

Q. Now what at the present time, do you have an opinion as to whether it would presently be, whether a reasonable and prudent man would presently be justified in expending his time and means to develop these particular claims with a reasonable prospect of being able to sell the (limestone) deposits from these claims at a profit?
A. I do have an opinion on that.
Q. And what is your opinion on that?
A. That he could not do it now even if he could not do it in 1976.
(TR. 136–137)

20. *See supra* note 4.